**UNITED STATES of America, Appellee,**

v.

**Ronald James TOMS, a/k/a Block, Appellant.**

**No. 97–3047.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 22, 1998.

Decided Feb. 27, 1998.

Rehearing Denied April 17, 1998.

---

**178**

Veronice A. Holt, Washington, DC, argued the cause and filed the brief for appellant.

Elizabeth H. Danello, Assistant United States Attorney, Washington, DC, argued the cause for appellee, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, Washington, DC, and John R. Fisher, Assistant United States Attorney, were on the brief.

Before: EDWARDS, Chief Judge, WALD, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Ronald James Toms ("Toms") was convicted of conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base; possession of 50 grams or more of cocaine base with intent to distrib-

ute; using or carrying a firearm during and in relation to a drug trafficking crime; and carrying a pistol without a license. Because of the amount of drugs the district court found to be involved in the conspiracy, Toms was assigned a base level of 38 under the United States Sentencing Guidelines ("the Guidelines"). Toms now appeals his convictions and his sentence, contending that there was insufficient evidence to convict him of using or carrying a firearm, that the district court improperly admitted expert testimony as to his intent to distribute, and that the district court made an incorrect finding as to the amount of drugs involved in the conspiracy. Because we find these claims to be without merit, we affirm Toms's convictions and sentence.

## I. BACKGROUND

On November 9, 1993, a grand jury returned a thirteen-count superseding indictment against Toms and two codefendants, Jimmy Thomas, Jr. ("Thomas"), and Keith Donnell Bradley ("Bradley"). All three men were charged with conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base from 1987 to October 1993 in the Paradise and Mayfair housing complexes in northeast Washington, D.C. (21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii), 846 (1994)). Toms and Thomas were also charged with distributing cocaine base on two dates in 1993 (21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii), (b)(1)(B)(iii) (1994); 18 U.S.C. § 2 (1994)), and Toms and Bradley were charged with possession of 50 grams or more of cocaine base with intent to distribute (18 U.S.C. § 2 (1994); 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii) (1994)); using or carrying a firearm during and in relation to a drug trafficking crime (18 U.S.C. §§ 2, 924(c) (1994)); and carrying a pistol without a license (D.C.CODE ANN. §§ 22–3204(a), 105 (1996)). Thomas and Bradley both pled guilty.[1]

Among the evidence put forward by the government to prove the conspiracy was the testimony of Thomas, Toms's co-defendant.

**1.** Thomas pled guilty to the indictment. Bradley pled guilty to the charge of possession with intent to distribute on September 10, 1993; the remain-

ing charges against him were dismissed pursuant to plea agreement.

Thomas testified that Toms had supplied him with at least an ounce (28 grams) of cocaine base for distribution on "hundreds" of occasions from 1987 to 1993. Transcript ("Tr.") 1/13/95 at 123–24.

The remaining charges against Toms stemmed from an incident on September 10, 1993. On that date, Elbert Kibler, a cooperating witness, saw Toms, Bradley, and a third man enter Thomas's apartment building in northeast Washington. Kibler called the Federal Bureau of Investigation ("FBI"), which had been investigating the conspiracy. FBI agents set up a surveillance of the area and watched as Toms and Bradley left the building, got into a Toyota Land Cruiser (with Toms in the driver's seat and Bradley in the passenger's seat), and drove off. The agents followed the car, which they had initially intended to trail to its destination; when Toms began speeding and weaving in and out of traffic, the agents initiated a traffic stop. After removing Toms and Bradley from the car, the agents noticed a loaded, nine-millimeter, semi-automatic pistol on Bradley's seat.

A search of Toms incident to arrest yielded approximately $2,000 in cash, an identification card, and an electronic pager. The FBI later searched the Land Cruiser pursuant to warrant and retrieved a plastic bag containing 67.8 grams of cocaine base from under the rear seat and over $8,000 in cash from an air vent.

Both Toms and Bradley testified that Toms had no knowledge that the gun was in the car and that the gun belonged to Bradley. See Tr. 1/23/95 at 130, 157 (Toms); id. at 12, 83 (Bradley). Toms also denied any involvement in drug dealing or knowledge of the drugs found in the Land Cruiser. See id. at 101, 130. He claimed that the money found in the air vent of the car was to be used to cover the costs of recording a compact disc and was in the air vent for safekeeping. See id. at 131, 150. The jury subsequently convicted Toms of the conspiracy and the three counts related to the September 10th incident. Toms's motion for a new trial was denied.[2]

The presentence report assigned to Toms a base offense level of 38 under the Guidelines based on Thomas's testimony that he had received at least 28 grams of cocaine base from Toms on "hundreds" of occasions. See Tr. 1/13/95 at 123–24; U.S. SENTENCING GUIDELINES MANUAL [hereinafter "U.S.S.G."] § 2D1.1(c)(1) (1997). On April 7, 1995, Toms moved for a hearing, seeking to question Thomas and Bradley and gain access to their presentence reports and alleging that Thomas's testimony was unreliable. The district court denied Toms's motion on March 4, 1997, crediting Thomas's testimony and concluding that even taken at its most conservative (28 grams on each of one hundred occasions), Thomas's testimony supported a finding that Toms had distributed 2.8 kilograms of cocaine base, resulting in a base offense level of 38. The district court also adopted the report's recommendation that Toms's base offense level be enhanced by four levels for his role in the conspiracy, see U.S.S.G. § 3B1.1(a), and by two levels for obstruction of justice, see U.S.S.G. § 3C1.1, yielding a total offense level of 44.[3] Because Toms had reached the Guidelines' sentencing cap of level 43, see U.S.S.G. Ch. 5, Pt. A, intro. comment (offense level greater than 43 to be treated as offense level of 43), he was sentenced to concurrent terms of life imprisonment for the conspiracy and possession convictions, to be followed by concurrent, five-year terms of supervised release. Toms also received a consecutive five-year term for using or carrying a firearm, to be followed by three years of concurrent supervised release, and a concurrent, one-year term for carrying a pistol without a license.

Toms now appeals his convictions, contending that there was insufficient evidence to prove that he had knowledge of the pistol found in the Land Cruiser and that the district court improperly admitted expert testimony as to his intent and knowledge. He also challenges his sentence, renewing his

---

**2.** Toms's motion to vacate his convictions pursuant to 28 U.S.C. § 2255 (1994) is still pending in the district court.

**3.** Toms does not challenge these two enhancements on appeal.

argument that Thomas's testimony was an insufficient and unreliable basis for the district court's conclusion as to the amount of drugs involved in the conspiracy.

## II. ANALYSIS

### A. The Weapon Convictions

Toms raises two challenges to his convictions arising from the pistol found in the Land Cruiser. We agree with his contention that a portion of the jury instructions was given in error, but because we find this error harmless and his second challenge meritless, we reject both challenges.

■ Toms's first challenge is to the jury instruction given on the section 924(c) charge,[4] which included the following:

The essential elements of the offense of use and carrying of a firearm during and in relation to a drug trafficking offense, each of which the government must prove beyond a reasonable doubt are:

1. That the defendant used or carried a firearm;

2. That the defendant did so knowingly and intentionally; and

3. That the defendant did so during and in relation to a drug trafficking crime.

*You're instructed that the word "use" can mean any use, such as the maintenance of a firearm for security or protection purposes.*

*The government need not show that the defendant actively employed the firearm or that the firearm was fired. It is sufficient to show the defendant actually or constructively possess[ed] a firearm in order to prove that he used it.*

You're instructed that the word "carry" means to bear on or about one's person. A firearm is carried on or about one's person if it is located in such proximity to the person as to be convenient of access or within reach....

Tr. 1/24/95 at 128 (emphases added). As the government concedes, *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), which the Supreme Court decided after Toms's conviction, renders the district court's instruction on "use" error. *See id.* at 141–43, 116 S.Ct. at 505 (conviction for "use" of a firearm under section 924(c) "requires evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense").

Toms, unremarkably, did not object to this instruction, as it was consistent at the time with the prevailing law in this circuit. *See, e.g., United States v. Bailey*, 36 F.3d 106 (D.C.Cir.1994), *rev'd*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). In *United States v. Smart*, 98 F.3d 1379 (D.C.Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1271, 137 L.Ed.2d 349 (1997), under similar circumstances, we noted that we would, under the supervening-decision doctrine,[5] apply *Bailey* retroactively "to vacate any prior conviction in which such an instruction was given where it might have caused the jury to conclude that the defendant's awareness of and proximity to a gun nearby in a drug transaction constituted a forbidden 'use' of the gun"—in other words, if the error could not be said to be harmless. *Smart*, 98 F.3d at 1393.[6] The evidence introduced at trial was that the gun was found in the seat where Bradley had been sitting after he was removed from the car, a decidedly nonactive

---

**4.** Section 924(c) prohibits the use or carrying of a firearm "during and in relation to any crime of violence or drug trafficking crime." *18 U.S.C. § 924(c)(1)*.

**5.** *See, e.g., United States v. Washington*, 12 F.3d 1128, 1139 (D.C.Cir.1994) (court will consider issue not raised at trial "where a supervening decision has changed the law in appellant's favor and the law was so well-settled at the time of trial that any attempt to challenge it would have appeared pointless").

**6.** The government cites *Johnson v. United States*, —— U.S. ——, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), for the proposition that where a defendant fails to object to a jury instruction later rendered erroneous by a supervening decision, the instruction is reviewed for plain error rather than for harmless error. The fact that the instruction given in this case survives even a harmless error analysis makes consideration of this contention unnecessary.

employment. Thus, if Toms's section 924(c) conviction rested wholly on the jury's conclusion that he "used" a firearm during the drug trafficking incident, that conviction would have to be vacated.

■ Nevertheless, as we noted in *Smart*, any error in the "use" instruction would be harmless if the jury necessarily found that Toms "carried" the firearm within the meaning of section 924(c).[7] *Smart*, 98 F.3d at 1393. The "necessarily" is crucial, for "a verdict [is required] to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *see also United States v. Washington*, 106 F.3d 983, 1013 (D.C.Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 446, 139 L.Ed.2d 382 (1997). In *Washington*, for example, we upheld the convictions of the defendant police officers under section 924(c) because the only evidence in support of their convictions showed that the officers were wearing service pistols on their persons during the drug trafficking incidents; as a result, the jury could not have found that they "used" the pistols without also finding that they "carried" the weapons. Toms now argues that the jury could not have reached a similar conclusion in his case.

We can easily reject this contention. As in *Smart*, the jury also convicted Toms of carrying a pistol without a license in violation of section 22-3204(a) of the D.C.Code.[8] The jury was instructed that in order to obtain a conviction on this charge, the government had to prove, *inter alia*, (1) that Toms carried a pistol openly or concealed on or about his person; and (2) that he carried the pistol knowingly and intentionally. *See* Tr. 1/24/95 at 130; *see also Butler v. United States*, 614 A.2d 875, 885 (D.C.1992). Under the prevailing law of this circuit and of the District, "carry" is interpreted identically for both section 924(c) and section 22-3204(a): the weapon must be convenient of access and within reach. *See, e.g., United States v. Anderson*, 881 F.2d 1128, 1141 (D.C.Cir. 1989); *Henderson v. United States*, 687 A.2d 918, 920–21 & n. 6 (D.C.1996); *see also* Tr. 1/24/95 at 128 (jury instruction). Thus, in order to find that Toms "carried" the gun under section 22-3204(a), the jury had to credit the officers' testimony regarding the location of the gun—on the passenger's seat of the car Toms was driving—and conclude that Toms was aware of the gun's presence. These are the same findings the jury would have had to make in order to find that Toms "carried" the gun for purposes of section 924(c). Thus, by returning a guilty verdict on the section 22-3204(a) charge, the jury necessarily concluded that Toms also carried the gun under section 924(c). The district court's instruction on "use" was harmless error.

■ Notwithstanding this conclusion, however, Toms argues that he was wrongly convicted of both of the weapon charges because there was insufficient evidence to support a finding that he had the requisite knowledge that the gun was in the car.[9] As

---

7. The indictment charged Toms with both the use and carrying of a firearm during the drug trafficking offense on September 10, 1993, and so a valid conviction could have been obtained under section 924(c) if the jury concluded that Toms had carried the firearm during the offense.

8. Section 22-3204(a) provides, in pertinent part:
No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed.
D.C.CODE ANN. § 22–3204(a).

9. Both the section 924(c) charge and the section 22-3204(a) charge require proof that the defen-

dant possessed the weapon knowingly and intentionally. *See, e.g., United States v. Powell*, 929 F.2d 724, 727 (D.C.Cir.1991); *Butler*, 614 A.2d at 885. Toms does not challenge the sufficiency of the evidence on the remaining elements of either charge (*i.e.*, that the weapon was within his reach, that his possession was "during and in relation to a drug trafficking crime," that the pistol was operable, and that he was not licensed to carry a pistol in the District of Columbia), and, in any event, there was ample evidence that these elements were satisfied. *See, e.g., United States v. Eyer*, 113 F.3d 470, 476 (3d Cir.1997) (gun within reach inside passenger compartment of car satisfies "carry" element of section 924(c)); *United States v. Range*, 94 F.3d 614, 617 (11th

the government notes, trial counsel did move for a judgment of acquittal on this basis as to "the gun charge" at the close of the government's evidence,[10] but he failed to renew this motion at the close of all evidence. As a result, Toms's challenge would normally be reviewed for plain error. *See, e.g., United States v. White,* 1 F.3d 13, 17 (D.C.Cir.1993). However, Toms has claimed that this failure constituted ineffective assistance of counsel, which, as the government concedes, requires that his challenge be analyzed under the two-part test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under that test, Toms must show both (1) that trial counsel's performance was deficient—that counsel's representation "fell below an objective standard of reasonableness"—and (2) that the deficient performance prejudiced the client—"that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687–88, 694, 104 S.Ct. at 2064, 2068. Because ineffective assistance claims typically require an evidentiary hearing, we "normally do not resolve them on direct appeal, instead remanding to the district court." *United States v. Gaviria,* 116 F.3d 1498, 1512 (D.C.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 865, 139 L.Ed.2d 763 (1998). However, this tendency to remand has two exceptions: "when the trial record alone conclusively shows that the defendant is entitled to no relief *and* when the record conclusively shows the contrary." *Id.* (internal quotes omitted). Thus, we need not decide whether Toms's trial counsel was deficient if, upon reviewing the record, we can conclude that there is no reasonable probability that Toms would have prevailed on a motion for judgment of acquittal even if one had been made—in other words, we arrive at Toms's insufficient evidence argument by an alternate route. We thus review "the evidence *de novo,* in [the] light most favorable to the Government, in order to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Moore,* 97 F.3d 561, 563–64 (D.C.Cir.1996) (internal quotes and citations omitted). Our review is deferential and draws no distinction between direct and circumstantial evidence. *United States v. Moore,* 104 F.3d 377, 381 (D.C.Cir. 1997); *United States v. Harrison,* 931 F.2d 65, 71 (D.C.Cir.1991).

■ Because the gun was not found on Toms's person, the government's case necessarily rested on a theory of constructive possession. In order for the government to prove that Toms constructively possessed the gun discovered in the Land Cruiser, it needed to establish that he "knowingly [was] in a position to exercise dominion and control over the object possessed, either personally or through others." *Harrison,* 931 F.2d at 71; *see also Brown v. United States,* 546 A.2d 390, 394 (D.C.1988). The government offers two theories as to Toms's knowledge. First, it contends that the jury's return of a verdict of guilty as to the section 924(c) charge must necessarily be interpreted to mean that the jury discredited Toms's testimony that he knew nothing of the gun and instead found that he knowingly possessed it. Second, the government argues that the jury could infer knowledge by looking to the evidence that Toms and Bradley were involved in an ongoing drug-selling operation and concluding that Toms therefore controlled the gun either directly or through Bradley. The first of these arguments is not a sufficient basis upon which to affirm Toms's conviction. In *United States v. Zeigler,* 994 F.2d 845 (D.C.Cir.1993), we declined to allow the jury's discrediting of the defendant's testimony to make up for a shortfall in the sufficiency of the government's evidence. "There is no principled way of deciding," we noted, "when the government's proof, less than

---

Cir.1996) (same); *Henderson,* 687 A.2d at 921 n. 6 (same with regard to section 22-3204(a)).

10. "As to the gun charge, I think there is insufficient evidence that there be [*sic*] joint possession of the weapon. So I think there's been insufficient evidence on that. The government's entire theory in this case, which goes beyond what the actual evidence is of Mr. Bradley sitting on the weapon, is that that's evidence that he's the enforcer, and that the gun would not be in the possession, dominion and control of the defendant. It's not even consistent with their theory of the case. So I move for acquittal on that." The motion was denied. Tr. 1/20/95 at 153–54.

enough to sustain the conviction, is nevertheless enough to allow adding negative inferences from the defendant's testimony to fill the gaps." *Id.* at 850. To be sure, the jury is free to discredit any witness before it on the stand and even to believe the exact opposite of the matter to which the witness has testified. Our review as an appellate court, however, would be frustrated if we were to allow such discrediting to constitute an essential part of the government's case—we cannot tell, from the lifeless words on the printed page of the transcript, whether the testimony memorialized therein is worthy of belief. The government therefore cannot rely on the jury's discrediting of Toms's testimony to prove an element of its case.

■ The government's second argument, however, ultimately proves more compelling, although viewed as an argument for co-conspirator liability—that because Toms was engaged in a drug distribution conspiracy, he is responsible for any acts committed by his co-conspirators in furtherance of the conspiracy, *see, e.g., Pinkerton v. United States,* 328 U.S. 640, 646–48, 66 S.Ct. 1180, 1183–85, 90 L.Ed. 1489 (1946)—it fails. As the indictment makes clear, and as the government concedes, the gun charges stemmed only from the September 10th incident and were not predicated on the conspiracy. In order for it to obtain a conviction on the gun charges, then, the government had to present evidence that could lead a jury to conclude that Toms himself was aware of the presence of the gun in the car, not simply that he was involved in a conspiracy with the person under whom the gun was found. *Cf. In re Sealed Case (Sentencing Guidelines' "Safety Valve"),* 105 F.3d 1460, 1464–65 (D.C.Cir. 1997) ("Linking participation in an ongoing drug trafficking enterprise to constructive possession of a gun requires an additional inferential step, one that we think should not be made . . . without some additional evidence supporting that step.").

As the second prong of the government's argument suggests, however, there was sufficient evidence of Toms's drug-selling activities such that the jury could have concluded that Toms was aware of the gun's presence in the Land Cruiser on September 10th and thus constructively possessed the gun.[11] As we have noted elsewhere, although "mere proximity" to a gun is insufficient to establish constructive possession, evidence of an additional factor establishing that the defendant was in a position to exercise dominion or control over the gun—" 'including connection with a gun [or] proof of motive' "—coupled with proximity may be sufficient. *Moore,* 104 F.3d at 381 (quoting *United States v. Gibbs,* 904 F.2d 52, 56 (D.C.Cir.1990)); *see also United States v. Jenkins,* 981 F.2d 1281, 1283 (D.C.Cir.1992). Where, as here, the gun is found in a place occupied by more than one person, the sufficiency of the evidence analysis depends on whether the evidence plausibly suggests " 'the likelihood that in some discernible fashion the accused had a *substantial* voice vis-à-vis the [gun].' " *United States v. Foster,* 783 F.2d 1087, 1089 (D.C.Cir.1986) (quoting *United States v. Staten,* 581 F.2d 878, 884 (D.C.Cir.1978)) (emphasis in *Foster*).

The government introduced evidence both as to connection and as to motive to show that Toms, because of his drug activities, was accustomed to keeping a gun nearby for protection. Thomas, for example, one of Toms's co-conspirators, testified that he had seen Toms carrying a gun "[a] lot of times" and that Toms often kept a gun hidden in his car. Tr. 1/13/95 at 139. In addition, the wealth of testimony that connected Toms to drug dealing—credited by the jury in its conviction of Toms for the conspiracy as well as for the drugs recovered from the Land Cruiser—provided a motive for Toms to have a gun close at hand, namely, protection of the drugs and money in the car.[12] Admittedly,

---

**11.** Toms did not challenge the admissibility of this evidence during the trial, nor does he do so on appeal. In any event, although Rule 404(b) of the Federal Rules of Evidence prohibits the admission of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith," the rule permits

such evidence to prove, among other things, intent, knowledge, and motive. Toms put his knowledge at issue in the case when he testified that he did not know that the pistol was in the car.

**12.** To be clear on this point: This evidence was not introduced to show that because Toms had

the government's case was not as overwhelming as it would have been had the gun been located under Toms's seat or on his person rather than on Bradley's seat; we have noted that "[o]ther factors being equal, it is less likely that one exercises a right of control over an item physically held by another than over an item in some common area readily accessible to all present." *Harrison,* 931 F.2d at 72. Nonetheless, given the evidence presented, the jury was entitled to conclude that despite the fact that the gun was found where Bradley had been sitting, it was there for Toms's benefit—in other words, that Toms knew of the gun's presence and intended to use it, or direct that it be used, should it become necessary to do so. We reached much the same conclusion in *Harrison,* which also involved the discovery of guns and drugs in a vehicle stopped by the police. Although the only guns recovered in that case were found on the persons of the other occupants of the vehicle, we held that because the jury found that the defendant intended to distribute the drugs recovered from the vehicle, the jury could reasonably have concluded that if it became necessary, the defendant would either "use one of his confederates' guns to shoot back, or else instruct one of them to do so"—in other words, the jury could have inferred that the defendant had " 'some appreciable ability to guide the destiny' of the weapons." *Id.* at 73 (quoting *Staten,* 581 F.2d at 883). We see no reason to reach a different conclusion in this case.

Because the record is clear on the sufficiency of the evidence to support the weapon charges, we need not remand for further factfinding on the adequacy of trial counsel. Considering the evidence presented at trial in the light most favorable to the government, we conclude that there was sufficient—although not overwhelming—evidence to convict Toms on the section 924(c) and section 22-3204(a) charges.

carried a gun on other occasions or because he had dealt drugs, he was the type of person who would carry a gun on the date in question; admission for this purpose is specifically forbidden by the first part of Rule 404(b) of the Federal Rules of Evidence. Rather, the evidence was introduced to show intent, motive, knowledge and/or absence of mistake with respect to the gun found in the Land Cruiser. Admission for

**B.** *Expert Opinion Testimony*

As part of its case-in-chief, the government called Johnny St. Valentine Brown, an officer with the Metropolitan Police Department, as an expert in the distribution schemes of illicit drugs.[13] The prosecutor then posed the following hypothetical, the facts of which mirrored the September 10th incident:

> Now, assume a person is driving in a vehicle, and is pulled over for driving recklessly, Detective Brown, and when the passenger in that vehicle is pulled out, he is found to be sitting on a gun. Now, assume later 67 grams of crack are found under the rear seat, over $8,000 is found in the air conditioning vents, and the driver of the vehicle has $2,000 on his person. What would be the relationship there between, let's say, the gun and the drugs and the roles of these various individuals?

Tr. 1/20/95 at 99. At this point, defense counsel objected, stating, "I note an objection to ultimate conclusion; don't object to what it could be." His objection was overruled. *Id.* Brown then responded:

> In my opinion, the individual sitting on the gun, that individual in that particular instance is the enforcer. That is the reason he's sitting on that gun. The individual operating the vehicle in that situation would be the supplier of those substances. This individual is this supplier's enforcer. So again, guns and drugs go hand in hand, and of [course], the way in which drugs are transported is by various modes of transportation such as cars, vans and the like. So to find drugs in the vehicle, an individual possessing a weapon, and monies, that's pretty much standard par for the course.

these purposes is permitted under the second part of Rule 404(b).

**13.** As we have often noted, the *modus operandi* of drug dealers is a suitable topic for expert testimony because it is "not within the common knowledge of the average juror." *United States v. Boney,* 977 F.2d 624, 628 (D.C.Cir.1992).

*Id.* Toms now argues that the district court improperly admitted the testimony of Officer Brown under Rule 704(b) of the Federal Rules of Evidence. Rule 704(b) provides:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Toms contends that because the hypothetical posed to Brown mirrored the facts of the September 10th incident, Brown's testimony that the driver was the "supplier" and that the passenger was the "enforcer" constituted impermissible testimony as to Toms's mental state—specifically, his intent to distribute the drugs found in the car and his knowledge as to the presence of the gun. The government, however, argues that Brown testified only to the *modus operandi* of a typical drug operation and the roles of the individuals involved in such an operation and therefore did not encroach on the realm of impermissible testimony adverted to in Rule 704(b).

We should note, to begin, that we have several times disapproved of the method of questioning used by the government in this case. Although in earlier cases we held that an expert is permitted to state "that certain conduct fits a specific role in a criminal enterprise—even though the conduct described exactly parallels conduct that other evidence explicitly links to a defendant," *United States v. Mitchell,* 996 F.2d 419, 422 (D.C.Cir.1993), we have more recently, beginning in 1995, recognized that mirroring hypotheticals often present " 'a line that expert witnesses may not cross.' " *United States v. Boyd,* 55 F.3d 667, 671 (D.C.Cir.1995) (quoting *Mitchell,* 996 F.2d at 422). The danger, as we noted in *Boyd,* is that even when an expert does not explicitly identify the defendant in her answer, her testimony in response to such a hypothetical will suggest that the expert pos-

sesses knowledge of the defendant's mental state, which may be used by a jury "to cure the ambiguity that they face." *Id.* at 672. Because it is the job of the jury to decide whether a defendant has a particular mental state, such mirroring hypotheticals often violate Rule 704(b): Although framed as a hypothetical, they call for the expert essentially to testify as to the mental state of the defendant.

■ We review a trial judge's admission of evidence for abuse of discretion. *Smart,* 98 F.3d at 1386. Moreover, as we noted in *Smart,* we consider

> two key elements in deciding whether expert testimony violates Rule 704(b): (1) the language used by the questioner and/or the expert, including use of the actual word "intent" and (2) whether the context of the testimony makes clear to the jury that the opinion is based on knowledge of general criminal practices, rather than some special knowledge of the defendant's mental processes.

*Id.* at 1388 (internal quotes omitted). Although, as in so many cases involving expert witnesses on drug distribution, the question is close, we conclude that the admission of Officer Brown's testimony here did not violate Rule 704(b). To begin with, Toms's trial took place in January 1995; at that time, we had not yet issued our opinion in *Boyd,* which clearly held that such mirroring hypotheticals were impermissible.[14] Second, this case can be distinguished from recent cases involving the same issue in that neither the question posed to Officer Brown nor his answer referred explicitly to intent. By contrast, in most of our previous cases warning about the danger of mirroring hypotheticals, the question concluding each hypothetical was clearly intended to elicit testimony as to the defendant's intent. In *Boyd,* for example, the mirroring hypothetical was followed by a question asking the expert whether, in his opinion, "that person's possession of the mixture or substance [is] possession for per-

---

**14.** We trust that we can rely on government counsel's representation that the end of the line is in sight as far as appellate review of this litigation strategy is concerned. *Boyd* was decided four months after the trial in this case, and government counsel assured us at oral argument that the government no longer asks mirroring hypotheticals of its expert witnesses in drug cases.

sonal use or is it consistent with possession with intent to distribute?" *Boyd*, 55 F.3d at 670. Similarly, in *Mitchell*, both the prosecutor's question and the expert's response contained the word "intent." *See Mitchell*, 996 F.2d at 422.

It is not necessary, of course, that the precise word "intent" be used for a Rule 704(b) violation to occur. We held in *Smart*, for example, that an expert's testimony, in response to a mirroring hypothetical, that the individual "met the elements" was impermissible because the legal connotations of the word "elements" could easily have led the jury to interpret the word to refer to *statutory* elements—in other words, that the individual possessed the necessary intent to distribute. *Smart*, 98 F.3d at 1387–89. In this case, however, neither the question asked nor the answer given crossed *Smart*'s line of impermissibility. The government asked Brown for his opinion as to the "relationship" between the people mentioned in the hypothetical; Brown's answer—in which he identified the driver as the "supplier" and the passenger as the "enforcer"—was responsive to this question without purporting to describe Toms's intent. Indeed, in the remainder of his answer, Brown testified that guns, drugs, and large amounts of money were typically found in tandem. In context, then, his testimony as to the roles of the people in the car is more properly viewed as testimony on the elements of a drug operation, based on "knowledge of general criminal practices," rather than an opinion on the intent of the individuals described. We thus hold that Officer Brown's testimony did not violate Rule 704(b) and affirm Toms's convictions.

## C.  *Toms's Sentence*

Finally, Toms argues that it was error for the district court to sentence him based on the testimony of Thomas who, Toms contends, was an unreliable witness. As a result of this error, Toms argues, he was ultimately sentenced for more than ten times the amount of drugs alleged in the indictment and more than forty times the amount for which he was convicted as a result of the September 10th traffic stop.

Our review of the district court's sentence is guided largely by our decision in *United States v. Lam Kwong–Wah*, 966 F.2d 682 (D.C.Cir.1992). In *Lam*, we noted that in *United States v. Patrick*, 959 F.2d 991 (D.C.Cir.1992), this circuit had joined the majority of other circuits in holding that because the quantity of drugs involved in a conspiracy or distribution charge "is not a basic element of the offense," its determination is relevant only to the issue of punishment and thus is "a sentencing factor to be determined by the judge." *Lam*, 966 F.2d at 685 (citing cases). Toms does not dispute this conclusion but argues that because his case constituted an "extraordinary upward departure," *Lam* requires that the judge's factual determinations be supported by clear and convincing evidence, rather than by simply a preponderance of the evidence.

While we acknowledged in *Lam* the possibility that "extraordinary circumstances" might call for the application of a higher standard, we concluded that no such circumstances were present in Lam's case. *Lam*, 966 F.2d at 688. Lam had been convicted of conspiracy to distribute heroin; the district court, concluding that Lam "knew or reasonably could have foreseen" that 3.4 kilograms were slated for the first delivery, *id.* at 685, based Lam's sentence on that amount. In rejecting Lam's claim that a higher standard of proof was required in his case due to the impact of that finding on his sentence, we distinguished *United States v. Kikumura*, 918 F.2d 1084 (3d Cir.1990), in which the Third Circuit required a heightened burden of proof, by noting that while Kikumura's sentence was based in part on conduct for which he was not charged (namely, terrorist acts), Lam's sentence "was determined solely on the basis of conduct of which he was actually convicted"—the conspiracy to distribute heroin. *Lam*, 966 F.2d at 687–88. We also noted that Lam's counsel had conceded that Lam had scienter as to enough heroin to support a base offense level of 28; the 3.4 kilogram quantity assigned him a base offense level of 34. "While a six-level increase [was] not insignificant," we noted, it did not present the "enormous" twenty-two level disparity involved in *Kikumura* that

warranted the satisfaction of a higher burden of proof. *Id.* at 688.

The circumstances of Toms's case are virtually indistinguishable from Lam's. As in *Lam*, Toms's sentence was determined "solely on the basis of conduct of which he was actually convicted"—the conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base. Moreover, Toms concedes that he was convicted of possession with intent to distribute of 67.8 grams (the amount retrieved from the Land Cruiser), a conviction that yields a base level of 32. The 2.8 kilogram amount found by the district judge yields a base level of 38—as in *Lam*, a six-level difference. Given the parallel between these two cases, we can see no reason to conclude that Toms's case, unlike Lam's, requires application of a clear and convincing evidence standard.

■ Toms next argues that the district court's reliance on Thomas's testimony was reversible error. He contends that Thomas's estimate of the amount of cocaine base he had received from Toms was inconsistent with other portions of his testimony—for example, the amount of money Thomas stated that he, as a dealer, had made during the course of the conspiracy[15]—and that Thomas admitted on the stand that certain statements he had previously made to an undercover officer were untrue.[16] Given these indicia of unreliability, Toms argues, the district court erred in using Thomas's testimony as the basis for determining Toms's sentence.

■ We noted in *Lam* that in reviewing factual determinations supporting a Guidelines sentence, we give substantial deference to the findings of the district court. *Lam*, 966 F.2d at 688. We reverse the district court's conclusions "only if we are left with a definite and firm conviction that it is mistak-

en" and give full recognition to the fact that determining credibility and weighing evidence is a job for the factfinder, not for this court on review. *Id.* at 689 (internal quotes omitted). In light of these principles, we reject Toms's challenge. In its memorandum opinion denying Toms's motion, the district court found Thomas to be a credible witness for several reasons. First, the court noted that Thomas had told a cooperating witness and an undercover officer in mid-1993 about the amount of drugs Toms could supply him for sale, a point in time before Thomas was himself charged with any crime and thus might have had a reason to shift the blame to another participant. Thomas's information proved to be accurate when the witness and the undercover officer successfully purchased 84.58 grams of cocaine base from him. Second, the court noted that future attempts by the undercover officer to purchase drugs from Thomas after Toms was arrested were unsuccessful, further lending credibility to Thomas's testimony that Toms was his supplier. And finally, the court noted that additional evidence presented at trial, including a tally sheet found on Toms's person, bolstered Thomas's credibility as to the amount of drugs involved in the conspiracy. Toms, for his part, does not point to any evidence in the record that directly contradicts Thomas's testimony as to the amount of drugs involved; rather, he simply asserts that Thomas was not to be believed given the doubtful nature of some of his other testimony. Whether that testimony—or, indeed, any of Thomas's testimony—was open to question, however, is not for us to decide, given that Thomas's credibility can be assessed only by judging his demeanor on the witness stand. As we have already noted, such a determination in a sentencing proceeding properly belongs to the district court that participated in the trial, and we see no reason in this case to disturb its judgment.[17]

---

15. Thomas testified that he did not make more than $20,000 over the course of the conspiracy, *see* Tr. 1/13/95 at 174, although he later testified that he could not estimate the amount.

16. Thomas admitted that he had previously lied to the officer about whether he had any drugs available for sale. *See* Tr. 1/13/95 at 165.

17. In fact, it is not inconceivable that, given the illegitimacy of the drug trade, Thomas would be unable to estimate the amount of money he had made from drug dealing; nor is it surprising that he would at times be reluctant to inform a potential customer and/or rival of the extent of his supply. In any event, neither statement on its face provides sufficient reason to doubt the veracity of the remainder of Thomas's testimony.

### III. CONCLUSION

Because we reject Toms's challenges to the sufficiency of the evidence presented at trial, the expert testimony, and his sentence, we affirm his convictions and his sentence.

*It is so ordered.*