# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

--------

Argued December 10, 2004       Decided January 18, 2005

No. 04-3033

UNITED STATES OF AMERICA,
APPELLEE

v.

ANTOINE MILLER,
APPELLANT

--------

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00161-01)

--------

*Jensen E. Barber*, appointed by the court, argued the cause and filed the briefs for appellant.

*John P. Mannarino*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *John R. Fisher* and *Thomas J. Tourish, Jr.*, Assistant U.S. Attorneys.

Before: GINSBURG, *Chief Judge*, and GARLAND, *Circuit Judge,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: In November 2003 a jury convicted Antoine Miller of (1) possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for one year or more, in violation of 18 U.S.C. § 922(g)(1); and (2) possession with intent to distribute cannabis, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). The main issue on appeal is Miller's claim that the district court violated Federal Rule of Evidence 704(b) by allowing the government's drug expert to testify whether an individual's role in a particular hypothetical scenario—one closely matching Miller's activities as depicted to the jury—was consistent with that person's being "in the business of selling drugs." As the defendant made no objection, we review for plain error; we find none. We also reject Miller's other claims.

\* \* \*

According to the government's evidence, police officers conducting an undercover drug operation at the 1200 block of Valley Avenue, S.E., Washington, D.C., approached Miller in their car. Miller asked one officer "what did [he] need?" and the officer replied, "I need a dub"—a term the government's expert witness later explained meant a $20 bag of marijuana. As Miller approached the car, someone in a nearby building yelled "five-oh, five-oh"—also explained by the expert, who said it derived from the television program "Hawaii Five-O" and was commonly used to alert drug trade participants to the arrival of the police. Miller ran, and the officers gave chase. As he ran, Miller removed items from his pocket and dropped them to the ground, and then shed his jacket and dropped it. Catching him after a brief foot chase, the officers recovered his jacket and found in it ten small

ziploc bags containing marijuana and a .22 caliber revolver loaded with six rounds of ammunition.

Metropolitan Police Department Detective Tyrone Thomas testified as an expert drug witness for the government. After saying that he was not familiar with the investigation and had not taken part in it, he explained various items in the non-experts' testimony. Besides addressing the items mentioned above, he said that the 1200 block of Valley Avenue, S.E. was a well-known area for marijuana sales; that people will often make drug purchases while remaining in their cars; that marijuana is usually sold in clear ziploc bags; that drug dealers often discard outer clothing, so as to mislead officers who have joined the chase in response to calls for help that describe the quarry's clothing; and that drug dealers often carry guns but commonly have no money on them. After this testimony, the following exchange took place with the prosecutor:

> Q: Detective Thomas, based on the scenarios that you just discussed where you have a person who engages in a conversation with another to transfer a dub to that other individual and that person is later found to have approximately ten Ziploc bags of the size that you saw in Government Exhibit Number 2, based on those facts, do you have an opinion as to whether or not those drugs that were found on that individual, whether or not it's consistent with an intent to distribute?

> A: Yes. Based on the scenario that I was given and the fact that the quantity that

> he had in that scenario, that would [b]e consistent with someone I believe is in the business of selling drugs on the streets of the District of Columbia for a profit.

The question's reference to "the scenarios you have just discussed" would naturally have been understood by jurors to encompass all the details Thomas had previously explained.

\* \* \*

Miller first claims that the district court abused its discretion in finding that Thomas's testimony met the standards of Rule 702 of the Federal Rules of Evidence for admission of expert testimony; he particularly denies that evidence about the *modus operandi* of drug dealers in the Washington, D.C. area would help the jury understand other evidence. But we've repeatedly found the operations of narcotics dealers a suitable topic for expert testimony "because they are not within the common knowledge of the average juror." *United States v. Boney*, 977 F.2d 624, 628 (D.C. Cir. 1992). We see no abuse of discretion on that score here.

Miller also objects that Thomas's testimony violates Rule 704(b)'s ban on an expert witness's giving an opinion as to "whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." Fed. R. Evid. 704(b). The district court's admission of expert testimony is subject to reversal only for abuse of discretion. See *Boney*, 977 F.2d at 628.

Because Miller failed to object at trial we review for plain error. For Miller to prevail (1) the error must have been obvious; (2) Miller must carry the burden of showing that the error was likely to have affected the outcome of the trial; and (3) the appellate court must be persuaded that the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Young*, 470 U.S. 1, 15 (1985) (quotation marks and citation omitted); see also *United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Saro*, 24 F.3d 283, 286-87 (D.C. Cir. 1994). In this case we get off at the first stop; we find no obvious error.

We have previously said "that testimony should not be excluded under Rule 704(b) as long as it is clear that the expert is testifying on the basis of his knowledge of general criminal practices and not on some special knowledge of the defendant's mental processes." *United States v. Bailey*, 319 F.3d 514, 521 (D.C. Cir. 2003). We said that this inquiry required consideration of

> (1) the language used by the questioner and/or the expert, including use of the actual word "intent"; and (2) whether the context of the testimony makes clear to the jury that the opinion is based on knowledge of general criminal practices, rather than "some special knowledge of the defendant's mental processes."

*United States v. Smart*, 98 F.3d 1379, 1388 (D.C. Cir. 1996); see also *Bailey*, 319 F.3d at 521.

In this case, Thomas made clear that he had no personal knowledge of the case against Miller. Although the

prosecutor asked Thomas whether the described "scenario" suggested an "intent" to distribute, the witness avoided the word in his answer, moving the colloquy somewhat towards *modus operandi* evidence. Further, we have previously held that even when the prosecutor uses the "i" word in formulating a question, there is no Rule 704(b) violation if it is made clear that the expert had no knowledge of the actual case before the jury. See *United States v. Williams*, 980 F.2d 1463, 1465-66 (D.C. Cir. 1992).

At the same time, the hypothetical question posed to Thomas, viewed in light of his entire testimony, approaches the type that is "a carbon copy of the matter before the jury," which we have found to violate Rule 704(b), *United States v. Boyd*, 55 F.3d 667, 669 (D.C. Cir. 1995), at least where the expert has failed to explain his complete lack of information about the defendant himself, *id.* at 672. "[W]hat is proscribed is questioning that produces responses suggesting some special knowledge of the defendant's mental processes," including testimony that "the hypothetical individual's possession was 'consistent with intent to distribute.'" *United States v. Watson*, 171 F.3d 695, 703 (D.C. Cir. 1999). At some point, plainly, the pile-up of data in the mirroring hypothetical may undercut the witness's disclaimer of any direct knowledge of the specific case. Not only have we disapproved of the method, but government counsel in an earlier case gave its assurance that it "no longer asks mirroring hypotheticals of its expert witnesses in drug cases." *United States v. Toms*, 136 F.3d 176, 185 n.14 (D.C. Cir. 1998). Perhaps government counsel have launched an avoidance strategy: asking a succession of questions about individual details of the crime scene, and then, referring (as they did here) to "the scenarios that you just discussed" and to some additional details, asking the witness's view of the

(hypothetical) participant's intent. If intended to circumvent *Boyd*, the device is far too transparent.

Nonetheless, the obviousness requirement for plain error adds some leeway for the district court to that already afforded by the abuse of discretion standard—though exactly how much, we cannot say. See *United States v. Sumlin*, 271 F.3d 274, 280 (D.C. Cir. 2001) (contrasting the two standards). The extra leeway is enough, however, to say that, in the light of our holding in *Bailey* and Detective Thomas's repeated assertions that he had no personal knowledge of the case against Miller, any abuse of discretion wasn't obvious enough to qualify as "plain error."

Miller also asserts a number of sentencing errors. First, he suggests that the district court "misunderstood its legal authority" to depart downward. But he points to nothing that might overcome the presumption that "the district court kn[ew] and applie[d] the law correctly." See *United States v. Pinnick*, 47 F.3d 434, 439 (D.C. Cir. 1995) (internal citation omitted).

Second, Miller claims that the court mistakenly treated his drug trafficking conviction here as "another felony offense" within the meaning of § 2K2.1(b)(5). That section calls for a four-level upward bump in base offense level for firearms violations committed "in connection with another felony offense." True, Application Note 18 explicitly excludes some "trafficking offenses" from "another felony offense," but the exclusions mentioned are only "explosives or firearms possession or trafficking offenses," *not* drug trafficking ones. See *United States v. Gomez-Arellano*, 5 F.3d 464, 466 (10th Cir. 1993).

Miller makes a confusing argument that the district court wrongly placed him in criminal history Category VI under § 4B1.1. Although he concedes that he was properly classified as a career offender under § 4B1.1(a), he apparently believes that the guideline placing career offenders in Category VI was inapplicable because his base offense level was determined by the firearms conviction, rather than by the career offender provision. (Whichever calculation yields the higher base level offense controls.) But § 4B1.1(b) says that "[a] career offender's criminal history category in *every* case under this subsection shall be Category VI" (emphasis added), not merely in cases in which the career offender classification accounted for the base offense level. See *United States v. Marseille*, 377 F.3d 1249, 1256-57 (11th Cir. 2004).

Finally, Miller argues that when the district court considered his prior convictions in computing his sentencing range under the Guidelines, it could, under *Blakely v. Washington*, 124 S. Ct. 2531 (2004), take into account the "timing" or "nature" of the relevant offenses only if supported by admissions by Miller or by jury findings. By "nature," Miller refers to whether the prior convictions were for "violent" felonies; by "timing," he refers to whether the offenses or convictions (Miller's wording is obscure) "happen[ed] prior to the commission of the instant offense." We assume for purposes of this argument only that *Blakely* will be held to cover Guidelines mandates as well as statutory ones–an issue pending before the Court in *United States v. Booker*, No. 04-104, and *United States v. Fanfan*, No. 04-105 (argued Oct. 4, 2004).

*Blakely*, of course, was an application of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and quoted *Apprendi*'s own statement of its holding: "*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime

beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely*, 124 S. Ct. at 2536 (quoting *Apprendi*, 530 U.S. at 490 (emphasis added)). *Apprendi* in turn had noted the Court's prior decision in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), upholding use of a prior conviction that had not been charged in the indictment, and "treat[ed] the case as a narrow exception to the general rule" requiring charge in an indictment, submission to the jury, and proof beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. Thus, *Apprendi* and *Blakely* leave no room for us to alter the "narrow exception" for sentence enhancements based on prior convictions (whether mandated by a statute or the Guidelines). Cf. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

Miller's argument, of course, would preserve the *form* of the exception. As he would have it, the sentencing court could, in applying a statute or Guidelines, rely on a prior conviction—excepting only the parts that matter: the nature of the offense and the timing. Indeed, Miller never explicitly challenges the continued validity of *Almendarez-Torres*. Moreover, the claim that *Apprendi* and *Blakely* justify a radical re-interpretation of *Almendarez-Torres* is undermined by *Apprendi*'s own characterization of the case as having "turned heavily upon the fact that the [sentence-increasing factor] was 'the *prior* commission of a *serious* crime.'" *Apprendi*, 530 U.S. at 488 (emphasis added) (quoting *Almendarez-Torres*, 523 U.S. at 230).

Apart from gutting the exception, Miller's position overlooks what a prior conviction actually *means*. In the normal case under the Guidelines, the only "nature" of a prior crime that would concern a sentencing court would have been the nature constituted by the elements of the crime charged, which would already, in the initial trial, have been charged and found by a jury (or judge in the event of waiver) beyond a reasonable doubt. See *Taylor v. United States*, 495 U.S. 575, 599-602 (1990); see also *United States v. Gabriel*, 365 F.3d 29, 32 (D.C. Cir. 2004) (recounting application of *Taylor* to Guidelines treatment of prior convictions generally). Alternatively they would have been formally admitted by the defendant by pleading guilty. Even *Taylor*'s own exception for a "narrow range of cases" where the jury was "actually required to find" additional facts, see *Taylor*, 495 U.S. at 602, would involve prior proceedings meeting *Apprendi*'s standards. To the extent that the lower courts have allowed the use of facts that had not been established under *Taylor*'s requirements, see discussion in *Gabriel*, 365 F.3d at 32, the Court's concerns in *Apprendi* and *Blakely* might require retrenchment; but Miller makes no claim that any such use occurred here.

As for the timing of the prior offenses and convictions, it seems highly improbable that the Court (assuming the continued validity of *Almendarez-Torres*) would apply *Blakely* to require an entire retrial to pin down an offense date, which is normally uncontroversial and unlikely to have been at issue in the initial trial, or a conviction date, which is usually manifested in a formal court record. At least in the absence of a claim that the dates of offense or conviction used by the district court for sentencing erred by a relevant margin—and Miller makes no such claim—we have no reason to regard the issue as distinct from the *Almendarez-Torres* exception.

11

The judgment of conviction and sentence are

*Affirmed*.