*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 1, 2024

Plaintiff-Appellee,

v

No. 363640
Allegan Circuit Court
LC No. 2022-024955-FH

ASHLEY ANN PIERCE,

Defendant-Appellant.

Before: LETICA, P.J., and BORRELLO and RICK, JJ.

PER CURIAM.

Following a jury trial,[1] defendant appeals as of right her convictions for assault with a dangerous weapon (felonious assault), MCL 750.82, and domestic violence, MCL 750.81(2). The trial court sentenced defendant to two years' probation with 20 days in jail for the felonious assault conviction[2] and three days in jail for the domestic-violence conviction. On appeal, defendant challenges the sufficiency of the evidence. We affirm.

## I. FACTUAL BACKGROUND

This case stems from a domestic incident between defendant and her ex-husband, Sean Pierce, during which defendant backed her vehicle down her driveway resulting in Sean being injured after being knocked to the ground. The former couple share a son, BP,[3] and, on a weekend in November 2019, BP was in defendant's care for the first time in seven months. On Sunday, defendant took BP and her three other children to her sister's house to visit their cousins. Defendant and Sean disputed whether there was an agreed-upon time that Sean would pick up BP that night.

---

[1] This was defendant's second jury trial because the first jury was unable to reach a verdict.

[2] Ten days would be suspended if defendant turned herself in by a specified date.

[3] BP was 15 years old when the incident occurred.

Sometime before midnight, defendant left her sister's house and began driving the children home. BP texted Sean that he was on his way back to defendant's home. When defendant arrived, Sean and his wife Tina were parked in defendant's driveway.

Sean made his way to the front passenger window of defendant's car to speak to BP. An argument ensued between Sean and defendant about where BP would stay that night. Defendant wanted him to stay with her while Sean wanted BP to return to his house. BP became upset and yelled that he did not want to be in the middle of his parents' argument. At some point during this argument, BP opened the front passenger door to get out of defendant's minivan. Sean moved to stand between the interior of the minivan and the open door as the former couple's argument continued. Thereafter, defendant put her minivan in reverse and began to back down her driveway as Sean yelled at her to stop because BP was trying to get out of her minivan. Tina overheard "stop" being yelled repeatedly. According to Sean, defendant responded negatively to his request to stop and she continued to back up her minivan. In order to avoid being struck by the van's open door, Sean was moving backward. Eventually, Sean was unable to keep pace and fell after he was "hit by the door[.]" Sean injured his knees and asked Tina to call 911.

After Sean fell, BP jumped from the moving minivan, hit his head, and suffered a concussion. Both Sean and BP sought follow up care.

At trial, BP and Tina testified. They corroborated Sean's version of the incident. BP also testified that, after defendant stopped the van, she got out and pursued him as he ran for Sean's vehicle.

A portion of Tina's 911 call was played for the jury. Therein, Tina reported that BP was supposed to be dropped off at their home at 8 p.m.[4] But defendant "wouldn't show up, wouldn't show up." Finally, at 12:30 a.m., defendant informed them that she was just taking BP home. They said no, explain[ed] that BP had school, and said that they would come to pick him up. Tina also described defendant "attacking" BP. Tina repeatedly told defendant to stop, explaining that

---

[4] BP testified that that he was supposed to be returned to Sean's home at 8 p.m. that Sunday. After talking to defendant while at his aunt's home, defendant told him that they should stay there and spend some more time. BP texted Sean to let him know they were going to be "a little later," about "a couple hours later." BP did not remember telling defendant that he wanted to stay a little bit longer because he was using his aunt's wi-fi.

According to BP, they did not leave his aunt's house until about 11 p.m. and would arrive at defendant's home at midnight. When they were almost back to defendant's home, BP texted Sean, telling him that they were almost there. Sean said he was going to come and pick up BP. Defendant knew that BP was texting Sean to tell him that they were heading back. But, when defendant testified, she denied being aware that BP was texting Sean that night. And when asked whether BP's contrary testimony was a lie, defendant responded: "I wasn't aware that – I don't know. I don't want to say that, but I mean, no, I wasn't aware that they were talking, and I wasn't aware that Sean was going to be there." The jury later inquired about defendant's testimony that she did not speak to Sean "at all" that night. Specifically, the jury asked: "[H]ow would Sean know not to pick [BP] up until morning?" Defendant answered: "I don't know."

defendant was preventing BP from entering their vehicle. Moreover, Sean is overheard saying that defendant is "going crazy" and that "someone needs to get here."

Michigan State Police Trooper Eric Desch responded to Tina's 911 call. Sean told the trooper that "it was the vehicle that knocked him over[;] the door specifically is what knocked him over. [Sean] didn't say anything . . . about tripping and then being struck." Rather, Sean conveyed that "[i]t was the car door that forced him onto the ground." Defendant told a different story. She said that "she believed the [van] door was closed as she began to back up." The van door opened thereafter, and she believed that Sean "ripped [BP] out of the vehicle." The next day, defendant informed Trooper Desch that Sean had assaulted her by pushing her and said that she wanted him charged.

After the prosecution rested, defendant moved for a directed verdict, arguing that the evidence failed to show that she had any intent to assault or batter Sean. The trial court denied defendant's motion because there was circumstantial evidence of her intent to injure Sean. More specifically, the court determined that: (1) there was evidence of an on-going argument about where BP would spend that night; (2) defendant was upset and did not want BP to leave; (3) the minivan's "door was open for some period of time before" defendant put it in reverse; and (4) there was testimony that defendant continued to back down the driveway despite being "told to stop[.]"

At trial, defendant testified in her own defense. She agreed that there was an argument between herself and Sean. According to defendant, Sean was screaming at her through the cracked window of the van and striking the side of the van. After BP was screaming and yelling that he did not want to be in the middle of his parents' dispute, she backed up. At that time, the van door was closed. As she was backing up, the minivan's interior light went on and the passenger-side door was opened. Defendant testified that she did not really see what had happened, but instantly threw the minivan into park once she realized BP was no longer inside. It all occurred so quickly, and she did not intend to harm or threaten Sean with her minivan. Defendant was unaware of exactly how Sean was injured because she did not see it. She said that she did not know how he fell or whether the door hit him when BP opened it.

Defendant's son CD and daughter AD also testified for defendant. CD described Sean as yelling and chasing the minivan before the door flung open, and BP jumped out at Sean's direction. AD testified that after she woke up, she saw Sean getting up off the ground by the minivan's passenger-side front tire. Thereafter, Sean approached BP and defendant, grabbed their arms, pushed them in opposite directions, and dragged BP into his vehicle.

The jury convicted defendant as charged.

## II. STANDARD OF REVIEW

"[T]his Court reviews de novo a defendant's challenge to the sufficiency of the evidence to support his or her conviction." *People v Speed*, 331 Mich App 328, 331; 952 NW2d 550 (2020). When examining the sufficiency of the evidence, the appellate court "reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006).

Due process requires that, before a defendant can be convicted of a criminal offense, the prosecution provides sufficient evidence that "could justify a trier of fact in reasonably concluding that defendant is guilty beyond a reasonable doubt[.]" *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979), citing *Jackson v Virginia*, 443 US 307, 317; 99 S Ct 2781; 61 L Ed 2d 560 (1979). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Whether the evidence is direct or circumstantial, the scope of review is the same. *Id*. "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (quotation marks and citation omitted).

### III. ANALYSIS

The elements of felonious assault, MCL 750.82, are "(1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v Chambers*, 277 Mich App 1, 8; 742 NW2d 610 (2007) (quotation marks and citation omitted). A simple assault is established by showing "either an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." *People v Gardner*, 402 Mich 460, 479; 265 NW2d 1 (1978) (quotation marks and citation omitted). A battery is defined as "an intentional, unconsented and harmful or offensive touching of the person of another . . . ." *People v Nickens*, 470 Mich 622, 628; 685 NW2d 657 (2004) (quotation marks and citations omitted).

The elements of domestic violence are that an individual "assaults or assaults and batters [(1)] his or her spouse or former spouse, [(2)] an individual with whom he or she has or has had a dating relationship, [(3)] an individual with whom he or she has had a child in common, or [(4)] a resident or former resident of his or her household." MCL 750.81(2).

Felonious assault and domestic violence are crimes that necessitate proof of a specific intent. See *People v Johnson*, 407 Mich 196, 210; 284 NW2d 718 (1979); *People v Corbiere*, 220 Mich App 260, 266; 559 NW2d 666 (1996) ("Domestic assault is a specific intent crime[.]"). To establish that a felonious assault occurred, the prosecution must prove that the defendant intended either to (1) injure the victim or (2) "put the victim in reasonable fear or apprehension of an immediate battery." *Johnson*, 407 Mich at 210. Similarly, to prove that domestic violence occurred, the prosecution must show "that the defendant either intended to batter the victim or that the defendant's unlawful act placed the victim in reasonable apprehension of being battered." *Corbiere*, 220 Mich App at 266.

"Intent is a mental attitude made known by acts." *People v Strong*, 143 Mich App 442, 452; 372 NW2d 335 (1985). Although "[i]ntent is a secret of the defendant's mind," *id.* (quotation marks and citation omitted), it "may be inferred from all the facts and circumstances." *People v Cameron*, 291 Mich App 599, 615; 806 NW2d 371 (2011). And, "because it can be difficult to prove a defendant's state of mind on issues such as . . . intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind[.]" *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

Defendant only contests the intent element of each conviction. Specifically, defendant argues that there was insufficient evidence to prove that she knew where Sean stood in relation to the door of the car, and, without sufficient evidence of her knowledge of this, a jury could not conclude that she intended to harm Sean.

The intent element for both convictions hinged primarily on a factual dispute—whether defendant was aware that Sean was in between the passenger door and the interior of her minivan before she began to back down the driveway. The prosecution presented evidence that defendant and Sean were arguing over where BP would spend the night. Defendant wanted BP to remain with her for various reasons, including so that he could say goodbye to his sisters. The prosecution witnesses testified that the minivan's door was open and that Sean was standing in the area between the minivan and the opened passenger-side door before defendant put her car in reverse. Sean even asked defendant to stop, but she responded negatively. Although the defense presented contrary evidence from defendant and CD that the passenger-side door was opened only *after* defendant began backing down the driveway, the jury did not credit their testimony.

Similarly, the jury was not required to accept that defendant was unaware of Sean's location because it was very dark outside.[5] To the contrary, defendant confirmed that opening the passenger-side door activated the interior dome light. Therefore, even if defendant's driveway area was very dark, Sean's presence in between the passenger door and interior of the minivan would have been illuminated after the passenger-side door was opened. Based on this evidence, a reasonable trier of fact could conclude that defendant was aware of where Sean stood before she reversed her minivan. Likewise, given Sean's position in relation to the minivan, defendant was aware that the open passenger-side door would strike him after she reversed her minivan. Despite defendant's recognition, she put her minivan in reverse and backed down the driveway, forcing Sean to trot backward until he could not keep up. A rational trier of fact could conclude that defendant reversed her minivan purposefully and intentionally because she wanted BP to stay with her rather than to leave with Sean. This conclusion is further supported by defendant's testimony and her statement to the trooper that she began backing down the driveway as a means of escaping the situation and removing the children from her argument with Sean. Therefore, the jury could reasonably conclude that defendant actively contemplated her options before executing them.

Indeed, the undisputed evidence showed that Sean and defendant were involved in an ongoing custody dispute over BP on the night of the incident. Viewing the evidence in the light most favorable to the prosecution, this was the first night in seven months that BP was with defendant. Defendant admittedly did not want BP to go home with Sean; instead, she wanted him to remain at her home. Defendant and Sean engaged in a heated verbal exchange, leading BP to caution them about putting him into the middle of their dispute. This evidence could reasonably be inferred as showing defendant's animosity toward Sean due to their ongoing custody dispute. And a reasonable jury could reject defendant's testimony that she did not intend to harm or threaten

---

[5] Sean testified that he believed that there was a light on in front of the garage or that there may have been a porch light in front of the door. The trooper also testified that he recalled some ambient light, perhaps a light or two outside of the house or perhaps a light inside "the house coming through the bay window."

-5-

Sean with her minivan, that she did not even realize Sean was in a position to be harmed by her minivan when she backed up, and that she did not know how Sean was injured or how BP got out of her minivan. More specifically, defendant previously informed the responding trooper that she believed that Sean had "ripped [BP] out of the car once the door was open[ed]." Yet, Sean, BP, and even CD, all testified that BP jumped out of the minivan. And, although defendant testified that she backed up after BP started screaming or yelling that he did not want to be in the middle of their argument, her initial statement to the trooper detailed her mental contemplation of her available options to escape the argument with Sean before she reversed her minivan. These discrepancies and BP's actions, jumping from defendant's minivan and running to Sean's car to evade defendant, could lead a rational trier of fact to find that her testimony was not as credible as that of the prosecution's witnesses.[6]

Defendant cautions that an appellate court must not "allow the jury's discrediting of the defendant's testimony to make up for a shortfall in the sufficiency of the government's evidence." *United States v Toms*, 329 US App DC 33, 39; 136 F3d 176 (1998).[7] But, in this case, the jury's decision to reject defendant's testimony as less credible than the testimony from the prosecution's witnesses did not make up for a shortfall in the sufficiency of the prosecution's evidence. Ultimately, whether defendant intended to injure Sean or put him in reasonable fear of a battery were factual questions best decided by the trier of fact. The jury had the advantage of not only hearing the witnesses' testimony, but also of judging their demeanor as they testified. Because the standard of review requires us "to draw all reasonable inferences and make credibility choices in support of the jury verdict," *Nowack*, 462 Mich at 400, we reject defendant's contention that the evidence was insufficient to support her convictions.

Affirmed.

/s/ Anica Letica
/s/ Stephen L. Borrello

---

[6] CD, the only other witness who testified that the minivan door was closed when defendant began reversing down her driveway, also testified that he had just woken up at the time the incident occurred and that he would *probably* not lie for defendant. A rational trier of fact could also conclude that CD's testimony was less credible than that of the prosecution's witnesses because CD had just woken up and because of his potential bias in favor of defendant, his mother.

[7] "[D]ecisions of intermediate federal courts are not binding on" an appellate court. *People v Lucynski*, 509 Mich 618, 638 n 10; 983 NW2d 827 (2022).