UNITED STATES of America, Appellee,

v.

Richard Paul SPINNER, III, Appellant.

No. 97–3061.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 22, 1998.

Decided July 28, 1998.

Rehearing Denied Sept. 21, 1998.

A.J. Kramer, Federal Public Defender, argued the cause and filed the briefs for appellant. Sandra G. Roland, Assistant Federal Public Defender, entered an appearance.

Michael Fitzpatrick, Assistant U.S. Attorney, argued the cause for appellee, with whom Wilma A. Lewis, U.S. Attorney, John R. Fisher, Mary–Patrice Brown and Matthew L. Levine, Assistant U.S. Attorneys, were on the brief.

Before: EDWARDS, Chief Judge, SENTELLE and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Opinion dissenting in part filed by Circuit Judge GARLAND.

SENTELLE, Circuit Judge:

Appellant Richard Spinner challenges his conviction on four weapons and narcotics charges. We agree with Spinner that the government introduced insufficient evidence to sustain his conviction for possession of a semiautomatic assault weapon, and accordingly reverse that conviction. And because the district court permitted the prosecutor to ask a defense witness a series of inappropriate questions on cross-examination, we reverse and remand Spinner's conviction for possession with intent to distribute crack cocaine within 1,000 feet of a school. We affirm the remaining convictions.

## I. Background

### A. The Offense

On August 8, 1996, at approximately 4:00 p.m., Washington Metropolitan Police Department officers and FBI agents executed a search warrant at 636 46th Place, S.E., in the District of Columbia. Four people were present at the time: Richard Spinner, his mother, his 16–year–old sister, and his 17–year–old cousin.

The officers discovered three loaded guns during the course of their search. Two of them—a .380 caliber Colt semiautomatic pistol and a .45 caliber Sturm–Ruger semiautomatic pistol—were found under the cushions of a couch in the living room. The third gun, a Colt .223 caliber semiautomatic rifle, was found in the closet of a second-floor bedroom, inside a rifle case. During their search of that closet, the officers also recovered sever-

al .223 caliber magazines of ammunition, a bulletproof vest, and two ski masks. In addition, the officers found 1.279 grams of crack cocaine, packaged in multiple ziplock bags, in the living room and second-floor bedroom.

The officers recovered documents relating to Spinner from the upstairs bedroom, including correspondence addressed to him; receipts bearing his name; his social security card; and a list—handwritten on an envelope bearing Spinner's fingerprint—of current prices for various quantities of crack cocaine. Spinner's fingerprints were also found on two other noteworthy items: a .45 caliber bullet, which was inside the .45 caliber pistol; and a box of .44 caliber bullets found in the closet where the semiautomatic rifle was recovered. The officers also found two photographs that depicted Spinner in the upstairs bedroom.

As a result of the officers' search, a federal grand jury returned a five-count criminal indictment against Spinner. The indictment charged Spinner with two counts of violating 18 U.S.C. § 922(g)(1), which makes it illegal for a convicted felon to possess "any firearm or ammunition." (Spinner had a 1993 felony conviction for possession of a firearm with a removed, obliterated, or altered serial number in violation of 18 U.S.C. § 922(k).) The indictment also charged Spinner with possession of a semiautomatic assault weapon, 18 U.S.C. § 922(v)(1); possession with intent to distribute cocaine base within 1,000 feet of a school, 21 U.S.C. § 860(a); and possession with intent to distribute cocaine base, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). No charges were brought against Spinner's sister or his mother. However, Spinner's cousin was prosecuted in a separate proceeding in juvenile court.

### B. The Trial

The government sought to prove that Spinner constructively possessed the recovered contraband. It argued that Spinner had access to the upstairs bedroom, and the ability to control the contraband that was found there. In support of this position, it introduced into evidence Spinner's personal papers that were found in the bedroom, as well as the photographs depicting Spinner in the bedroom. To prove that Spinner possessed the contraband intentionally, the government stressed the presence of Spinner's

fingerprints on the .45 caliber bullet, the box of .44 caliber ammunition, and the drug price list. It also introduced evidence of Spinner's "other crimes" pursuant to Federal Rule of Evidence 404(b) in order to show Spinner's intent to possess the contraband. In particular, the jury heard evidence that prior to his arrest Spinner had unlawfully possessed a semiautomatic handgun with an obliterated serial number, and that he had sold 25 ziplock bags of crack to an undercover officer in front of the house at which the search warrant was executed.

To make the case that the weapon recovered from the closet of the upstairs bedroom met the statutory definition of "semiautomatic assault weapon," the government introduced the testimony of Richard A. Turner, a firearms enforcement officer employed by the Bureau of Alcohol, Tobacco and Firearms. The district court permitted Turner to testify as an expert "concerning firearms, ammunition, identification, operation and design."

The statutory term "semiautomatic assault weapon" includes:

> a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—
>
> (i) a folding or telescoping stock;
>
> (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;
>
> (iii) a bayonet mount;
>
> (iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and
>
> (v) a grenade launcher.

18 U.S.C. § 921(a)(30)(B).

In response to the prosecutor's questions, Turner described the recovered weapon, which is commonly called an AR–15 rifle, as a "semiautomatic rifle which can accept a detachable magazine...." This testimony more or less tracks the statutory phrase: "a semiautomatic rifle that has an ability to accept a detachable magazine." Next, the prosecutor asked Turner: "And what are the features, just in general, that would turn this

[particular] weapon into a semiautomatic assault weapon?" Turner responded:

> Well, it has a telescoping shoulder stock. So that's one feature. And then it has a pistol grip *that extends beyond the bottom of the receiver. . . .* By having these two features, it would put it into the classification of a semiautomatic assault weapon.

(emphasis added). Here, Turner's language diverged from the language of the statute, which refers to a "pistol grip that protrudes *conspicuously beneath the action of the weapon.*" The prosecutor did not ask Turner to explain what he meant by "receiver," nor did she ask him whether that term was equivalent to the statutory term "action." Nor indeed did she ask any follow-up questions about Turner's conclusion. And while the record makes it clear that Turner had the weapon at issue in front of him on the witness stand, it is not apparent whether he pointed to the "bottom of the receiver" as he spoke.

Spinner's theory of the case was that he had not lived at the house for several months prior to his arrest, and that his cousin solely possessed the contraband. Both Spinner's cousin and his sister testified that the cousin had stayed in the upstairs bedroom frequently during the summer when Spinner was arrested. The cousin testified that he had hidden the guns, drugs and ammunition in the house himself, hoping perhaps to sell them in the future.

To establish that Spinner was not living at the house when the arrest took place, the defense called to the stand Spinner's girlfriend, Lolita Little. On direct examination, Ms. Little testified that Spinner had moved in with her in late June 1996, approximately two months before Spinner's arrest. On cross-examination, the prosecutor asked her if "last May" she had been "upset that Richard Spinner was letting his friend use his mother's house to sell drugs." Defense counsel objected. At the bench, the prosecutor explained that her "good faith basis" for asking the question was a letter dated May 13, 1996, that Ms. Little had written Spinner when he was incarcerated for an unrelated crime. In pertinent part, the letter, with expletives deleted, said:

> I hope your thoughts be straight and stop those m* * * * *f* * * * *s from using your mother and her home to do this s* * * because you wouldn't do that in their mother's s* * *, they wouldn't do that s* * * to their mothers out of respect.

The prosecutor explained that she intended to rebut the defense's suggestion in its opening statement that Spinner had "changed his life around" prior to "last May" by showing that Spinner had let his friend use his mother's house to sell drugs. She added that the defense is "asking the jury to believe [Spinner] changed his life and I think it's—the government should have the opportunity, first of all, for the jury to know what he was doing before this." She also argued that the challenged question was "entirely relevant to the government's argument that Mr. Spinner knew that [his cousin] was using, was selling drugs out of this premises." The defense objected to the question on the grounds that it was prejudicial, that it exceeded the scope of direct examination, and that it arguably constituted Rule 404(b) evidence for which the government did not provide sufficient notice.

The trial judge said he would permit the prosecutor to pursue this line of questioning because it undermined the credibility of the witness; indeed, he even urged the government to prosecute Ms. Little for perjury because he believed that the letter contradicted her earlier testimony. The judge also said that he would permit the prosecutor to proceed because the letter was evidence of Spinner's "other crimes, wrongs, or acts" under Rule 404(b) of the Federal Rules of Evidence because it related to his intent to distribute the narcotics seized from the house. The trial judge also found good cause to excuse Rule 404(b)'s requirement that the government provide reasonable notice of its intent to use the evidence, remarking that "when something arises in the defense case that was unexpected, that's a basis to excuse pretrial notice."

As the district judge was announcing this ruling, the lawyers realized that the judge mistakenly believed that Ms. Little had testified that she had never seen drugs at the

house or seen Spinner with drugs. The judge, it turns out, had confused Ms. Little with another witness who had so testified. When the lawyers pointed out the mistake, the trial judge nevertheless permitted the prosecutor to use the letter as a basis for cross-examination. (The letter itself was never admitted into evidence, and is not part of the record before us.)

Responding to the prosecutor's questions, Ms. Little denied seeing drugs around the house, and denied that her letter to Spinner referred to drugs. She interpreted her letter to mean that she wished Spinner would stop people from "drinking and cursing and laying up in his mother['s] house." The prosecutor also paraphrased a passage from the letter stating that Spinner "was no better than the friends that he let take advantage of his mother because he was greedy." Ms. Little denied that this passage referred to drugs. Finally, the prosecutor referred Ms. Little to a particular sentence of the letter, and asked: "Now, you were concerned in that sentence that if Mr. Spinner continued to do the s* * * that you referred to, he would end up locked up or dead, isn't that right?" Ms. Little assented, and reiterated that the reference to "s* * *" meant "cursing and drinking and laying around the house."

The jury found Spinner guilty on all of the counts of the indictment. At the sentencing hearing, the district court dismissed Count Five (possession with intent to distribute cocaine) because it was a lesser included offense of Count Four (possession with intent to distribute cocaine within 1,000 feet of a school). The district court sentenced Spinner to 92 months of imprisonment on Counts One and Two (the felon-in-possession counts) and Four, to be served concurrently. The court also imposed a 60–month concurrent sentence for Count Three, which was for possession of a semiautomatic assault weapon.

Spinner filed a timely notice of appeal.

## II. Discussion

### A. Sufficiency of the Evidence

Spinner argues that the evidence was not sufficient to support his conviction for possession of a semiautomatic assault weapon under 18 U.S.C. § 922(v). He avers that the government failed to prove that the AR–15 meets the statutory requirements for being a prohibited weapon. Citing *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), he also argues that the government failed to meet its burden of proving beyond a reasonable doubt that he possessed the required *mens rea* for conviction. *Staples* clarified the government's obligation to prove that a defendant *knew* that a given firearm had the characteristics that brought it within the scope of the statute rendering possession of the weapon unlawful.

### 1. Standard of Review

■ Our standard of review depends on whether Spinner preserved these arguments by moving for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Our precedents recognize that a "broadly stated" motion for judgment of acquittal "without specific grounds" is "sufficient to preserve [a] full range of challenges ... to the sufficiency of the evidence." *United States v. Hammoude*, 51 F.3d 288, 291 (D.C.Cir.1995); *see also United States v. Milton*, 8 F.3d 39, 45 (D.C.Cir.1993) (a "general claim of insufficient evidence" was sufficient to preserve a specific point of error not raised below). However, we review an appellant's sufficiency-of-the-evidence challenge for plain error when a motion for judgment of acquittal was based on specific (and different) grounds. *United States v. Sayan*, 968 F.2d 55, 62 (D.C.Cir.1992); *see also United States v. White*, 1 F.3d 13, 17 (D.C.Cir.1993) (recognizing that sufficiency-of-the-evidence challenge would be reviewed for plain error if no motion for judgment of acquittal was filed with respect to the counts of appellant's conviction); *but see United States v. Gjurashaj*, 706 F.2d 395, 399 (2nd Cir.1983) ("[W]hen a defendant moves for acquittal, even without specificity as to the grounds, it is incumbent upon the government to review its proof as to the facts required to establish each element of each offense alleged.").

■ Spinner moved for judgment of acquittal at trial. Addressing the semiautomatic assault weapon charge, his lawyer complained that "there has been no evidence

submitted whatsoever to indicate any possessory interest of my client in that firearm." He explained to the district court that "there has been no testimony of [Spinner's] fingerprints [on the AR–15], any testimony of [Spinner's] prior contact [with the AR–15]." He did not, however, suggest that the government failed to shoulder its obligations under *Staples*, nor did he intimate that the government had fallen short of proving that the recovered weapon met the statutory test for unlawfulness. Because Spinner did not raise before the district court the specific arguments he raises before us, we review them for plain error under *Sayan*.

■■■ Under Rule 52(b) of the Federal Rules of Criminal Procedure, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To be "noticed" under this rule, an error must be "plain" (or, in other words, "obvious") and "must have affected the outcome of the District Court proceedings." *United States v. Clarke,* 24 F.3d 257, 266 (D.C.Cir.1994) (quoting *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). When reviewing a sufficiency-of-the-evidence challenge for plain error, we reverse only to prevent a "manifest miscarriage of justice." *United States v. Jackson,* 824 F.2d 21, 26 (D.C.Cir. 1987) (quoting *United States v. Baber,* 447 F.2d 1267, 1270 n. 8 (D.C.Cir.1971)). Such a miscarriage would exist "only if the record is devoid of evidence pointing to guilt, or . . . because the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *United States v. Parker,* 133 F.3d 322, 328 (5th Cir.1998) (citation omitted); *accord United States v. Wright,* 63. F.3d 1067, 1074 (11th Cir.1995); *United States v. Meadows,* 91 F.3d 851, 855 (7th Cir.1996). It would be a manifest miscarriage of justice to let a conviction stand if the government failed to present any evidence on an essential element of the crime. *Id.; see also Beckett v. United States,* 379 F.2d 863, 864 (9th Cir.1967) (finding a manifest miscarriage of justice where "there was no proof of one of the essential elements" of the crimes charged).

In *White,* we expressed uncertainty as to how a plain error review of a sufficiency-of-the-evidence argument might differ from the standard of review we apply when the argument has been preserved. 1 F.3d at 17. When applying the latter standard, we determine, after viewing the evidence in the light most favorable to the prosecution, whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). That standard is itself "highly deferential." *United States v. Lucas,* 67 F.3d 956, 959 (D.C.Cir.1995). In *White,* we expressed difficulty in imagining a standard of review any more deferential than the *Jackson* standard. *See* 1 F.3d at 17; *see also United States v. Pennington,* 20 F.3d 593, 597 n. 2 (5th Cir.1994).

In any event, we need not resolve whether, or in what respect, the plain error standard might differ from the *Jackson* standard in the context of a challenge to the sufficiency of the evidence supporting a conviction, because we hold that the government failed to present any evidence on an essential element of a crime for which Spinner was convicted. Such a lapse would warrant reversal under either standard. *See Meadows,* 91 F.3d at 855 n. 6 ("[A] complete lack of any evidence of one of the essential elements of a crime is not only insufficient evidence, but too little evidence to avoid a manifest miscarriage of justice.").

## 2. Did the Government Prove that the AR–15 was a Prohibited Weapon?

First, we address the government's efforts to prove that the recovered AR–15 met the statutory definition of a prohibited semiautomatic assault weapon.

■■■ It is axiomatic that the government bears the burden of proving all elements of a crime beyond a reasonable doubt. Indeed, the Due Process Clause of the Fifth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Here, Spinner was convicted of violating 18 U.S.C. § 922(v)(1), which criminalizes the possession of a "semiautomatic assault weapon." A semiautomatic rifle, like that recovered from the upstairs

bedroom in this case, is such an unlawful weapon if it is able to accept a detachable magazine and has at least two of the following features:

(i) a folding or telescoping stock;

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a bayonet mount;

(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

(v) a grenade launcher.

18 U.S.C. § 921(a)(30)(B). To obtain a conviction under section 922(v)(1), the government must prove beyond a reasonable doubt that the recovered weapon satisfied the statutory requirements. In addition, as we shall discuss below, it must also prove beyond a reasonable doubt that Spinner knew that the recovered firearm possessed the characteristics that brought it within the scope of the statute. *See Staples v. United States*, 511 U.S. 600, 619, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994).

 The government sought to prove that the AR–15 possessed two (and only two) of the five enumerated statutory features, namely a "folding or telescoping stock," and a "pistol grip that protrudes conspicuously beneath the action of the weapon." It is undisputed that the government proved that the AR–15 was able to accept a detachable magazine, and that it possessed a "folding or telescoping stock." Therefore, the only issue

here is whether the government has proved that the AR–15 possessed a "pistol grip that protrudes conspicuously beneath the action of the weapon."[1]

The government's expert on firearms testified that the AR–15 had a "pistol grip that extends beyond the bottom of the receiver." On appeal, the government has furnished us with a glossary published by the Associations of Firearms and Toolmark Examiners, which defines "receiver" as "[t]he basic unit of a firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled." It is telling, we think, that the government has submitted a technical publication to explain the meaning of the term "receiver." Turner clearly used the word as a term of art, and not in a commonly understood sense. Since the prosecutor never asked Turner to explain what he meant by "receiver," and never asked Turner whether "receiver" was equivalent to the statutory term "action," the jury was not given any evidence to support a conclusion that the AR–15 possessed "a pistol grip that protrudes conspicuously beneath the action of the weapon." 18 U.S.C. § 921(a)(30)(B)(ii). This evidentiary vacuum on a key statutory element requires that we reverse the conviction.

 The government argues that the jury had the opportunity to see for itself whether the AR–15 possessed the required statutory features. The jury, this argument goes, could have examined the gun during its deliberations, and seen that the pistol grip

1. In a footnote in its brief, the government half-heartedly suggests that the AR–15 possessed a "flash suppressor," another of the features listed in section 921(a)(30)(B). In support of this assertion, the government refers us to the testimony of James Cairns, a government witness who was employed by a firearms manufacturer as a product safety and firearms control manager. When testifying about the AR–15, a weapon that was manufactured by his company, Cairns referred to a part of the weapon as "this piece here." The following colloquy with the trial judge ensued:

THE COURT: Which piece?
MR. CAIRNS: This one.
THE COURT: So the piece you're pointing to is at the front of the—at the very tip of the muzzle? You can't say this and that. You need to describe it so the court re-

porter understands what you're talking about.
MR. CAIRNS: I'll do my best, Your Honor. There's a flash suppressor attached to the—
THE COURT: What did you call it?
MR. CAIRNS: A flash suppressor. *That's what I'm calling it. I don't know what this particular device is.*
THE COURT: Is that a term of art?
MR. CAIRNS: *Yes, it's either a flash suppressor or a compensator of some sort. I have not seen this particular kind of device on the end. So maybe I'm wrong in giving it a name at all.*
(emphasis added). Even putting aside the fact that the government never argued at trial that the AR–15 possessed a flash suppressor, this equivocal testimony is clearly insufficient to prove beyond a reasonable doubt that the AR–15 possessed that statutory characteristic.

protruded "conspicuously beneath the action of the weapon." If the jury could have puzzled this out on its own, why would it matter that the testimony of the expert was deficient? In *Meadows*, the Seventh Circuit confronted a strikingly similar argument, and rejected it. 91 F.3d at 856. The weapon at issue in that case was a World War I era pistol or revolver that the defendant had modified by adding a stock that apparently enabled the weapon to be fired from the shoulder. Based on the testimony of an ATF expert that the weapon was unlawful, the defendant was convicted of possessing a firearm that was made in violation of the provisions of 26 U.S.C. § 5861(c). That statute defines the weapons it prohibits as follows:

> The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile *through a rifled bore* for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

26 U.S.C. § 5845(c) (emphasis added).

At trial, the ATF expert did not define or explain the term "rifled bore." *Meadows*, 91 F.3d at 853. Referring to a dictionary definition, the Seventh Circuit explained that "the term 'rifled' is derived from the verb 'to rifle,' which means 'to cut spiral grooves into the bore of (as a firearm or piece of ordnance)." *Id.* at 856 (quoting Webster's Third New International Dictionary 1954 (1986)). The *Meadows* court concluded that the absence of any testimony that the gun in question possessed a "rifled bore"—as well as the absence of any explanation as to what that term meant—was a fatal flaw in the government's case. Noting that the modified weapon at issue could well have had a smooth or a rifled bore, the court observed that "[t]here was no indication in the testimony that the bore was rifled, or that rifling was present in the bore." *Id.* at 857.

On appeal, the government argued that, notwithstanding the lack of testimony concerning the rifled bore, the jury simply could have looked down the barrel of the weapon during its deliberations, and determined on its own whether the bore was smooth or rifled. This argument failed to persuade the Seventh Circuit. "[W]hy," asked the court, "would the jurors have bothered to look down the barrel to determine if the bore was 'rifled,' if they had no explanation of what 'rifled' meant?" *Id.* It continued: "We do not see why a jury would look for a feature of the weapon that neither the parties, the witnesses, nor the judge suggested that the jury should examine." *Id.* Accordingly, the *Meadows* court concluded that there was "a complete gap in the evidence regarding this element." *Id.*

Since the defendant in *Meadows* had not preserved this objection by filing a proper motion for judgment of acquittal, the court applied a plain error standard of review. *See id.* at 854–55. Stressing the government's failure to prove that the weapon had a rifled bore and its additional failure to prove that the defendant knew that the weapon had this feature that made possession unlawful, *see Staples, supra,* the court reversed, concluding that allowing the defendant's conviction to stand would amount to a miscarriage of justice. *Id.* at 857.

Like the Seventh Circuit in *Meadows*, we also reject the government's argument that the jury, without any testimonial guidance, could have determined that the weapon satisfied the applicable statutory requirements. Granted, the jury in this case had the opportunity to examine the AR–15 during its deliberations. But without any explanation of the meaning of the statutory term "action," the jury had no evidentiary basis to conclude that the AR–15 met the statutory definition of a prohibited semiautomatic assault weapon. Indeed, not only was the term "action" never explained to the jury, the record reflects that the jury heard this term for the first time when the district court delivered its instructions.[2]

---

**2.** Although the government's closing argument could not have cured any evidentiary deficiencies in its case, we note that the prosecutor used neither the statutory term "action" nor the expert's term "receiver" in her summation. Rath-

er, she used a third term, arguing that "this pistol grip ... protrudes out from underneath the *frame* of the weapon." "Action," "frame" and "receiver" may indeed be synonymous in

### 3. Did the Government Prove the Required *Mens Rea* for Conviction?

Spinner argues that even if the government had proved that the AR–15 was a prohibited semiautomatic weapon, it failed to prove that he possessed the required *mens rea* of section 922(v). In *Staples v. United States*, the Supreme Court held that under 26 U.S.C. § 5861(d), which prohibits the possession of an unregistered automatic firearm, the government must prove beyond a reasonable doubt that a defendant knew of the features of the weapon that brought it within the scope of the statute. 511 U.S. 600, 619, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). The government concedes that the rationale of *Staples* applies to section 922(v) as well. Thus, the government must prove that Spinner knew of the features of the AR–15 that brought it within the scope of section 922(v).

■ Given our conclusion that the government failed to prove that the recovered weapon met the statutory definition of a forbidden semiautomatic assault weapon, it follows that the government similarly failed to prove beyond a reasonable doubt that Spinner knew that the AR–15 possessed the required statutory characteristics. Furthermore, although such knowledge "can be inferred from circumstantial evidence, including any external indications signaling the nature of the weapon," *Staples*, 511 U.S. at 615–16 n. 11, 114 S.Ct. 1793, we think the circumstantial evidence that Spinner knew of the AR–15's statutory characteristics is very thin. When he was arrested, Spinner was in the kitchen. The AR–15 was found in a rifle case in a closet in the upstairs bedroom. The authorities discovered no fingerprints linking Spinner to the weapon or the ammunition inside it. Although the bedroom contained numerous documents bearing Spinner's name (all but one of them dated prior to the month of the arrest), it also contained documents bearing the names of three other family members. The government argues that "[t]he jury could have inferred that [Spinner] had an unusually strong interest in assault weapons based on the discovery in the [upstairs bedroom] of a magazine advertisement for an entire book about an assault weapon." But there was no evidence presented that Spinner had even seen this article. Finally, both Spinner's cousin and his girlfriend testified that Spinner had moved to his girlfriend's house in June, 1996, two months before Spinner's arrest. Clearly, this evidentiary record falls far short of that in *United States v. Moore*, in which we found that evidence establishing that the defendant had handled a rifle and "was in continuous control of the weapon" was sufficient for a jury to conclude that the defendant had the requisite *mens rea* for possession of a sawed-off shotgun under 26 U.S.C. § 5861(d). 97 F.3d 561, 563–64 (D.C.Cir.1996).

Given the complete lack of evidence in the record that the AR–15 possessed "a pistol grip that protrudes conspicuously beneath the action of the weapon," 18 U.S.C. § 921(a)(30)(B)(ii), as well as the paucity of evidence that Spinner knew that the weapon possessed the features that brought it within the scope of the statute, we conclude that Spinner's conviction on this charge was a manifest miscarriage of justice, and we reverse it.

■ Because we reverse Spinner's conviction as a result of the insufficiency of the evidence supporting it, we need not pass on Spinner's argument that the jury instructions failed to explain the government's obligation to prove Spinner's *mens rea* under *Staples*. Nonetheless, in order to alert the district courts to this issue, we reproduce the jury instructions below:

> Count three of the indictment charges unlawful possession of a semiautomatic assault weapon. The essential elements of this offense ... are, one, that the defendant possessed a semiautomatic assault weapon and, two, that he did so knowingly and intentionally. A person, as I have said, acts knowingly and intentionally if he's conscious and aware of his act, realizes what he was doing and does not act because of mistake, inadvertence or accident. The term semiautomatic

this context. But without making it clear to the jury that these terms are synonymous, and indeed without defining any of them, the government left the jury without sufficient information to determine if Spinner had committed this crime.

assault weapon means a semiautomatic rifle that has an ability to accept a detachable magazine and has at least two of the following: [elements omitted]. It has to have at least two of those.

As the government acknowledges, "at worst, the[se] jury instructions may have insufficiently explained the scienter requirement regarding the relevant features of the rifle." Without taking any position on whether these instructions would have survived our review of them for plain error, we encourage the district courts to explicitly instruct juries, when appropriate, that the government must prove that a defendant knew of the particular features of a weapon that rendered its possession illegal. *See Staples, supra.*

### B. Scope of Cross–Examination

Spinner contends that the district court improperly permitted the prosecutor to cross-examine his girlfriend, Lolita Little, about a letter Ms. Little wrote to Spinner two months before his arrest in this case. As we recounted above, the prosecutor asked Ms. Little if "last May" she had been "upset that Richard Spinner was letting his friend use his mother's house to sell drugs." The prosecutor based her question on a letter dated May 13, 1996 that Ms. Little had written to Spinner when he was incarcerated for an unrelated crime.

Without referring to Rule 404(b), the prosecutor attempted to justify her questions by arguing that they were meant to rebut the defense theory of the case. She referred to the defense's opening statement in which, she claimed, counsel argued that Spinner "changed his life around" after his brother died in August of 1995. The letter showed— according to the prosecutor—that "Mr. Spinner knew that [his cousin] was using, was selling drugs out of this premises" in May of 1996. In particular, the prosecutor argued that Spinner, while incarcerated, was "aiding and abetting" his cousin's drug dealing at his mother's house in May of 1996. Based on this evidence, the prosecutor argued that "Mr. Spinner was not a changed man."

■ As we have noted, the government sought to use the letter to dispute that Spinner was a "changed man" who had "changed his life around" after his brother's death. Using the letter to paint Spinner as "greedy," and the kind of man who did nothing while "those m* * * * *f* * * * *s . . . us[ed][his] mother and her home to do this s* * *," the government clearly hoped to use the letter to convince the jury that Spinner had not "changed his life around"; it hoped, that is, to show that Spinner remained a criminal after his brother died. Using evidence for this purpose is forbidden by Rule 404(b) of the Federal Rules of Evidence, which provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."

■ We recognize that under Rule 404(b), "*any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character." *United States v. Miller,* 895 F.2d 1431, 1436 (D.C.Cir.1990). Rule 404(b) itself lists permissible uses of such evidence: "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In addition to arguing that the letter was intended to rebut the defense theory of the case— which, as we have explained, amounts to impermissible character evidence—the government also said that the statements in the letter were relevant to the witness's credibility and bias. If the letter did undermine the witness's credibility, the government could be said to have asked its questions for a reason other than to show Spinner's character. *See Miller,* 895 F.2d at 1436 (using bad acts evidence to show character is "the *one impermissible purpose* for such evidence" under Rule 404(b)). Under these circumstances, Rule 404(b) would pose no barrier to admissibility. The government, however, has not satisfactorily explained how the letter served to impeach Ms. Little. The prosecutor asked Ms. Little: "around the same time that you wrote this letter, you were also upset that Richard Spinner was letting his friend use his mother's house to sell drugs." But Ms. Little had not testified to the contrary when the prosecutor asked that question. Furthermore, we do not understand how Ms. Little's being upset under such circumstances would undermine her credibility at trial.

■ Nor do we agree with the district court's conclusion (not urged by the government) that the statements in the letter would be admissible to show "intent" or "absence of mistake" under Rule 404(b). In reaching this conclusion, the district court apparently agreed with the government that "do[ing] this s\* \* \*" meant drug dealing. But it seems just as likely to us that this reference is to using drugs as to selling them. Such a reading, we suppose, is equally consistent with the letter's conclusion that Spinner would "end up locked up or dead" if he continued to do this "s\* \* \*." Nor is it apparent that this reference is to crack cocaine, the narcotic at issue in this case. Nor is it clear that the reference is to narcotics at all. Under these circumstances, the statements in the letter have virtually no bearing on whether Spinner possessed crack cocaine with the intent to distribute it in this case.

■ Even if the government had questioned Ms. Little about the letter for a permissible purpose under Rule 404(b), it failed to provide "reasonable notice" to the defense of its intent to use the letter, as required by the rule. Rule 404(b) provides that "the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Here, the district court, mistakenly thinking that the government had asked the pertinent question in order to impeach a perjurer, ruled that "notice was not required" because "something [arose] in the defense case that was unexpected...." But Rule 404(b) does not empower a district judge to excuse the government from providing *any* notice that it intends to use bad acts evidence. That rule requires the government to "provide reasonable notice ... during trial if the court excuses pretrial notice on good cause shown...." The government provided no notice to the defense, reasonable or otherwise, of its intention to question Ms. Little about the letter. Without approaching the bench, the prosecutor simply asked Ms. Little about Spinner's refusal to stop his friends from using his mother's house to sell drugs. On appeal, the government makes much of the fact that it had provided the letter to the defense during discovery. But

providing such evidence to the defense in discovery is not enough to satisfy the notice requirements of Rule 404(b), which requires the government specifically to disclose "the general nature of any such evidence it intends to introduce at trial."

■ For the reasons discussed above, we conclude that the district court abused its discretion when it permitted the government to question Ms. Little about the letter. *See United States v. Graham*, 83 F.3d 1466, 1473 (D.C.Cir.1996). Furthermore, we cannot conclude that the admission of this testimony was harmless error. *See United States v. Clarke*, 24 F.3d 257, 267 (D.C.Cir.1994). In deciding whether error is harmless, we must "determine whether the error itself had a substantial influence on the verdict." *Id.*(internal quotation marks and citations omitted). In other words, "we must determine with fair assurance that the judgment was not substantially swayed by the error." *Id.*(internal quotation marks, ellipses and citations omitted).

The prosecutor emphasized the letter in her closing argument to the jury, suggesting to us that the letter may have had a "substantial impact" on the verdict. After summarizing the evidence against Spinner, the prosecutor concluded her remarks concerning Spinner's drug possession as follows:

> [Drug dealing] is what Lolita Little was referring to in her letter as something that if he didn't stop it he would get locked up or dead. And she suggested he had the ability to stop it. He had the ability to stop his friends from doing it. And he simply didn't. And that, ladies and gentlemen, makes him guilty of possession with intent to distribute crack cocaine within a thousand feet of Davis Elementary School.

In addition, the government did not have an overwhelming case against Spinner for possession of the crack cocaine recovered in the house: no fingerprint evidence connected Spinner to the crack, nor was any of the crack recovered from his person or presence. Finally, we note that, although the district court gave the jury limiting instructions on other evidence introduced pursuant to Rule 404(b), it did not provide a similar limiting

instruction for the statements in Ms. Little's letter, even though the court admitted them as "legitimate 404(b) evidence," and characterized them as "clearly prejudicial" to Spinner. *See United States v. Moore*, 732 F.2d 983, 990 (D.C.Cir.1984) (limiting instruction lessens potential prejudice of bad act evidence).

Because we conclude that it was not harmless error for the district court to permit the government to use the letter in its cross-examination of Ms. Little, we reverse Spinner's conviction for possession with intent to distribute cocaine within 1,000 feet of a school.

### III. Conclusion

For the foregoing reasons, we reverse Spinner's convictions for possession of a semiautomatic assault weapon and possession with intent to distribute cocaine within 1,000 feet of a school, and remand for resentencing. Spinner has raised additional arguments. We have given them full consideration, and determine that they warrant neither reversal of his remaining convictions nor discussion here. Accordingly, we affirm Spinner's convictions for possession of a firearm and ammunition by a convicted felon.

GARLAND, Circuit Judge, dissenting in part:

My colleagues reverse defendant Spinner's assault weapon conviction because they conclude that the evidence was insufficient to sustain the charge, and reverse his narcotics conviction because they conclude that the district court permitted prejudicial cross-examination of Spinner's girlfriend. I disagree with both conclusions and would affirm both convictions.

### I. The Gun

The majority holds the government's evidence insufficient on the assault weapon charge because they believe it "failed to present *any* evidence on an essential element" of the crime: to wit, that the AR–15 assault rifle possessed a "pistol grip that protrudes conspicuously beneath the action of the weapon." The government presented no evidence on this point, my colleagues say, because the government's expert failed to men-

tion the word "action" during his testimony. But the expert's failure is beside the point. The government did not need an expert's testimony to establish this element because it had much better evidence: it had the gun itself.

A photograph of the gun is attached to this opinion. *See* App. 1 (Gov't Ex. 48–C). Its "pistol grip" is quite prominent, and the majority does not suggest that the jury would have any trouble figuring out which part of the gun was the "pistol grip." Nor does the majority, or the defendant, contend that the word "conspicuously" was too vague for the jury to comprehend. Only the meaning of "action" is in dispute. But that dispute is simply irrelevant. The photograph clearly shows that the pistol grip protrudes conspicuously beneath *every* part of the weapon, whatever that part's name. Hence, even if the jury had no idea what the word "action" meant, as long as it understood the "action" to be a part other than the "pistol grip" itself, it is hard to see how a rational trier of fact could reach any conclusion other than that this element of the crime was satisfied.

The majority's citation to the Seventh Circuit's opinion in *United States v. Meadows*, 91 F.3d 851 (7th Cir.1996), does not support its conclusion, but the way in which that case differs from this one is instructive. First, there was *no* evidence in that case that the weapon at issue had a rifled, as compared to a smooth, bore—the key statutory feature. It was not just that the jury's attention had not been drawn to the issue. Even by the time of the appeal, the record did not indicate what kind of bore the weapon had. The court found that the weapon "may have contained either a smooth bore or a rifled bore," because "[t]he record nowhere indicates which." Indeed, "[t]he old pistol ... may well not have had a rifled bore." *Id.* at 857. That is not the case here. The attached photograph makes clear that the AR–15 did have the necessary element—a protruding pistol grip.

Second, the *Meadows* court found that even if the weapon actually had a rifled bore, there was no way for the jury to know that without "look[ing] down the barrel." *Id.* Since the *Meadows* jury had no reason to

know that looking down the barrel was important, the court found no reason to believe the jury would have "bothered" to do so. *Id.* But no such "bother" was required of Spinner's jury. The expert—whatever else his failings—held the gun up directly in front of the jury, and both the gun and the attached photograph (Appendix 1) were admitted into evidence. As long as the jurors had their eyes open during either the testimony or their own deliberations, they necessarily would have seen the essential element.

The majority also accepts Spinner's argument that even if the government did prove the AR–15 was a prohibited weapon, it failed to prove he had the required *mens rea.* As *Staples v. United States,* 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), makes clear, and as the majority agrees, the government needed to prove only that Spinner knew the gun had the feature in question; it did not have to prove he knew the feature was illegal. *See Bryan v. United States,* —— U.S. ——, ——, 118 S.Ct. 1939, 1946, 141 L.Ed.2d 197 (1998). This means the government needed to prove only that Spinner knew the gun had a pistol grip protruding conspicuously beneath the action.

How could the government meet that requirement? Surely it did not have to present evidence that Spinner was told the weapon's grip extended in that way. We do not expect defendants to have their own personal ATF experts on hand to advise them of their weapons' special features.[1] Under *Staples,* the defendant's knowledge "can be inferred from circumstantial evidence, including any external indications signaling the nature of the weapon." *Id.* at 615 n. 11, 114 S.Ct. 1793. We held in *United States v. Moore,* 97 F.3d 561, 564 (D.C.Cir.1996), for example, that a defendant's knowledge that a sawed-off rifle was shorter than the lawful sixteen inches could be inferred from the fact that length is readily observable. No evidence that the defendant ever measured the weapon's 13–1/16–inch barrel was required, even though the difference between that and a 16–inch barrel is less than obvious to the naked eye. *See also United States v. Foster,*

19 F.3d 1452, 1454 (D.C.Cir.1994) ("The readily apparent barrel length and general appearance of the sawed-off rifle ... are sufficient ... to establish that its owner knew the weapon needed to be registered...."). By contrast, the "external indication" of the nature of the AR–15 is obvious to the naked eye and no guess about its specific length is required. Accordingly, the only question is whether Spinner ever saw or handled the gun.

The majority suggests there was no such evidence. To be sure, there was no such *direct* evidence: no one testified to seeing Spinner with the gun. But the law has no preference for direct evidence over circumstantial, *see Moore,* 97 F.3d at 564, and often it is the latter that is the more reliable. Courts regularly affirm murder and bombing convictions notwithstanding the absence of an eyewitness who saw the defendant shoot the gun or light the fuse. *See, e.g., United States v. Kwong,* 14 F.3d 189, 193–94 (2d Cir.1994). Indeed, in *Moore* we found sufficient proof that the defendant knew the sawed-off rifle was too short based on the fact that he had control of the weapon through *constructive* possession—even without evidence that he ever handled the weapon after it had been sawed off. *Id.* at 564. Here, too, the jurors could reasonably rely on a wealth of circumstantial evidence that Spinner saw or handled the weapon. *See Staples,* 511 U.S. at 615 n. 11, 114 S.Ct. 1793.

First, there was more than enough evidence for a reasonable juror to conclude that a well-armed drug operation was based in Spinner's family home and employed the AR–15 in its work. The house was filled with all of the accoutrements of such an operation: semi-automatic weapons, magazines of extra ammunition, a bulletproof vest, two black ski masks, crack cocaine and ziplock bags. Moreover, a narcotics expert testified, based on the evidence recovered in the search, that the house was being used as a "stash house" from which narcotics sales were made. In such a business, the expert said, guns are used for intimidation and the

[1]. The jury could well have concluded that the defendant was something of a weapons expert himself. He previously had been convicted of illegal possession of a TEC–9 semi-automatic pistol, and the police found an advertisement for a book about assault weapons in a bedroom the jury rationally could have believed was his. *See infra.*

maintenance of control. Given this evidence, the jury was entitled to conclude it was no coincidence that the AR–15 was in the house, and that instead it was an integral part of the business' armament.

Second, there was more than enough evidence that Spinner was a participant in the drug operation, and that as such he would have handled or seen others handle the weapon. When the police entered the house, he was the only adult male present. His fingerprints were on a bullet inside a crackstained gun, on the container of a magazine of spare bullets, and on a list of current crack prices. Two undercover officers testified that they purchased twenty-five ziplocks of crack from him at the same house nine months before. The majority does not dispute the introduction of that evidence which, our cases hold, is probative of the fact that Spinner intended to possess and distribute the drugs found during the search, and tended to disprove his claim of mere innocent presence in the house.[2] The jurors were also told that the defendant previously had possessed unlawfully a semiautomatic weapon which, again, our cases hold "make[s] it less probable that the [weapons] found in the [house] ... were there by mistake or without [the defendant's] intent." *United States v. Brown*, 16 F.3d 423, 432 (D.C.Cir.1994); *accord United States v. Toms*, 136 F.3d 176, 183–84 & nn.11–12 (D.C.Cir.1998). With this evidence, the jury could readily have concluded that as a player in the operation, Spinner would either have handled or seen others handle the AR–15. *See Toms*, 136 F.3d at 183 (evidence of participation in drug conspiracy sufficient for jury to conclude that defendant had dominion and control over weapon not found on his person).

Finally, there also was specific evidence that the assault rifle belonged to Spinner or was under his direct control. The gun was found in a half-opened case in an open closet in an upstairs bedroom. Whoever lived in that bedroom plainly had control over the contents of the closet. And there was plenty of evidence for a jury to conclude that the bedroom was Spinner's. The police found a photo of him lying on the floor of the bedroom with his feet resting in the open closet. Inside the bedroom were several letters to Spinner postmarked in 1996, the last one dated just seven days before the search. Also in the bedroom were the kinds of personal identification a person needs for daily living, and that one would be unlikely to leave behind after moving out. These included Spinner's Social Security card, his check-cashing card, two medical assistance passes in his name, and a club membership · card. (Spinner's current car registration was found in the living room.) Spinner's fingerprints were found in the bedroom—on a current list of crack prices. They were also found in the closet itself—on a container of ammunition placed right next to the half-opened case containing the AR–15.

Our cases have repeatedly upheld jury findings of a defendant's actual or constructive possession of an item of contraband based on far more tenuous evidence than that offered by the government here.[3] There is no reason to treat this case differently. Accordingly, I would conclude that the evidence was sufficient to show both that the AR–15 assault rifle had a conspicuously protruding pistol grip and that defendant knew it did.

---

**2.** *See, e.g., United States v. Robinson*, 59 F.3d 1318, 1322 (D.C.Cir.1995); *United States v. Johnson*, 40 F.3d 436, 441 n. 3 (D.C.Cir. 1994); *United States v. Clarke*, 24 F.3d 257, 265 (D.C.Cir. 1994); *United States v. Washington*, 969 F.2d 1073, 1080–81 (D.C.Cir.1992).

**3.** See, e.g., Toms, 136 F.3d at 183–84 (evidence of prior drug dealing and that drugs were found in car was sufficient to prove that driver had constructive possession of weapon on seat of other occupant); *In re Sealed Case*, 99 F.3d 1175, 1179–80 (D.C.Cir.1996) (evidence that drugs were found near items tied to defendant ·was

sufficient to establish actual or constructive possession); *United States v. Fennell*, 53 F.3d 1296, 1299–1300 (D.C.Cir.1995) (evidence that defendants had keys and had just left apartment was sufficient to establish actual possession of contraband in apartment); *United States v. Harrison*, 931 F.2d 65, 72–73 (D.C.Cir.1991) (evidence that defendant intended to distribute drugs was sufficient to prove defendant had constructive possession of guns found on other occupants of car); *see also United States v. Jackson*, 124 F.3d 607, 610–11 (4th Cir.1997) (evidence that firearm was stored at defendant's mother's home was sufficient to show constructive possession).

## II. The Drugs

My colleagues reverse the defendant's narcotics conviction on the ground that the district court abused its discretion by permitting cross-examination of Spinner's girlfriend about a letter she wrote him. The majority concludes the district court erred because the letter was not admissible as a prior "bad act" under Rule 404(b). The letter did not describe a prior bad act, the majority says, because it did not appear to refer to prior drug dealing at all. But even if the letter were admissible under Rule 404(b), the majority holds, the district court still erred in permitting cross-examination because the government failed to provide reasonable notice that it planned to do so.

There is no need to address the question of whether the district court abused its discretion,[4] because the kind of error just described could not have been legally harmful to the defendant. To conclude that the error was harmful, and therefore grounds for reversal, we must conclude that it "affected substantial rights," Fed.R.Crim.P. 52(a).

This "means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). I cannot reach that conclusion here.

If the majority is correct in its description of the letter, it can hardly have been harmful. According to the court, the letter created either no inference, or such a weak inference, of prior drug dealing that it could not be admitted under Rule 404(b).[5] It is not "at all apparent," the majority says, that the reference in the letter was "to crack cocaine.... Nor is it clear that the reference is to narcotics at all. Under these circumstances, the statements in the letter have virtually no bearing on whether Spinner possessed crack cocaine with the intent to distribute it in this case." But under these circumstances, the letter also could not have had a prejudicial effect. If the references were only to "drinking and cursing and laying up," as Ms. Little contended, it is hard to see what prejudicial impact they could have had in a case filled

4. The majority states that the government undertook the cross-examination to rebut the defendant's claim that he had become a "changed man" and no longer was involved in drug dealing. My colleagues say that permitting such a rebuttal was an abuse of discretion because it is barred by Rule 404(b) as an argument about the defendant's character: i.e., a contention that Spinner was not a changed man. But if Spinner actually had presented such a defense, the government surely would have been permitted to rebut it. The Federal Rules of Evidence do not give defendants a free pass to present claims the government is barred from rebutting. If rebutting a "changed man" defense constitutes an effort to prove the defendant's character (and I am not sure that it does), then presenting such a defense must constitute such an effort as well. That is, by claiming that he is a changed man, Spinner must be claiming that he could not have committed the crime charged because he had changed his character and become law-abiding. But if that is his claim, then Rule 404(b) is not the rule that governs this case: Rules 404(a) and 405(a) are. And those rules permit the prosecution to cross-examine as to specific instances of past conduct in order to rebut a claim of good character advanced by the defendant. *See United States v. Roper,* 135 F.3d 430, 433 (6th Cir. 1998); *United States v. Moore,* 27 F.3d 969, 974 (4th Cir.1994); 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 404.11[2] (2d ed.1998); 1 John W. Strong, McCormick on Evidence § 191 (4th ed.1992).

I do not dissent on this ground, however, because in fact the defendant never offered any evidence in support of a changed man defense. Defense counsel's opening statement did suggest that defense and indicated it would be proven through the testimony of defendant's mother. But Spinner's mother never testified and defense counsel did not return to the argument in his closing.

5. The inference would have to have been quite weak to justify the majority's determination that it was inadmissible on this score. All the government needed to prove with respect to probativeness was that "'the jury could reasonably find the conditional fact—[here, that the defendant had engaged in drug transactions in the past]—by a preponderance of the evidence.'" *Clarke,* 24 F.3d at 264 (quoting *Huddleston v. United States,* 485 U.S. 681, 690, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)) (brackets in original). Thus, the majority's determination of inadmissibility means the inference could not meet even that minimal threshold. Indeed, the majority's determination means the inference must have been even weaker than that. In order to reverse the trial judge's conclusion that the letter did show prior drug dealing, the majority had to find the inference so weak that the judge's conclusion was an abuse of discretion. *See United States v. Graham,* 83 F.3d 1466, 1473 (D.C.Cir.1996).

with evidence of crack cocaine and assault weapons and bulletproof vests.

This conclusion is further bolstered by considering what actually transpired at the trial. The prosecutor asked Ms. Little whether certain phrases in her letter referred to drugs. The phrases themselves did not contain the word. Ms. Little said no, repeatedly and adamantly. No other evidence as to the meaning of the letter was offered. Although the prosecutor did argue very briefly that the references must have been to drugs, the judge gave the usual limiting instruction that lawyers' arguments are not evidence and that the verdict must be based only on evidence. We have repeatedly said this kind of instruction can mitigate the impact of improper jury argument. *See, e.g., United States v. Gatling,* 96 F.3d 1511, 1524 (D.C.Cir.1996); *United States v. Childress,* 58 F.3d 693, 716 (D.C.Cir.1995). With this extraordinarily weak evidence, it is hard to see how the defendant could have been prejudiced.

On the other hand, if a reasonable jury *could* have read the letter as referring to prior drug dealing by Spinner, then permitting the cross-examination was not error in the first place. If the letter did refer to prior drug dealing, it would have been admissible under Rule 404(b) to show Spinner's intent to possess and distribute the drugs found in the search—just as the district court held, *see* Trial Tr. 997–99 (Feb. 10, 1997), and just as the prosecutor argued to the jury, Trial Tr. 1151 (Feb. 11, 1997). The majority does not dispute this, and a host of our cases so hold. *See supra* note 2.

But, the majority contends, even if the cross-examination were permissible under Rule 404(b), the district court still abused its discretion because the government failed to give the defense "reasonable notice" of its intent to use the letter. Yet, a failure of notice alone cannot justify reversal. The defendant still must have suffered prejudice. *See United States v. Perez–Tosta,* 36 F.3d 1552, 1562 n. 9 (11th Cir.1994). Since this contention by the majority starts from the assumption that the evidence was admissible under Rule 404(b), the prejudice could not have come from the failure to give the defendant more time to argue that the evidence was inadmissible. Nor could the prejudice have come from defense counsel's lack of

time to prepare the witness. What better answer could Miss Little have given to the government's pestering questions than the response she did give: "Not ... drugs.... I know nothing of drug things." In any event, although the government did not file a Rule 404(b) notice, the letter was hardly the "complete surprise" defense counsel claimed it to be since the government had given it to counsel during discovery.

Finally, as against this extraordinarily weak evidence of prejudice—whether derived from the cross-examination itself or from the failure to give notice—we also must weigh the evidence arrayed against the defendant. Although the government's case may not have been "overwhelming," it did not have to be to establish harmless error. It only had to be strong enough to persuade us that whatever mild prejudice may have flowed from the cross-examination, it did not "substantially sway[ ]" the ultimate verdict. *United States v. Clarke,* 24 F.3d 257, 267 (D.C.Cir.1994).

The majority finds the government's evidence thin because "no fingerprint evidence connected Spinner to the crack." But while Spinner's fingerprints were not on the crack itself, they were on a list of current crack prices and on a bullet inside a crack-laced gun. And most of the crack itself was found inside the bedroom closet that appeared to be his. This, together with the other evidence recounted above, was strong evidence that Spinner was a member of the drug operation that used his mother's home as a "stash house." In any event, whatever inference of prior drug dealing the letter generated, it surely was weaker than, and "harmlessly cumulative" of, *see Clarke,* 24 F.3d at 267, the much more direct evidence of Spinner's prior dealing properly admitted through the testimony of the two undercover officers who bought twenty-five ziplocks of crack from him.

And against all of this, what was the defendant's theory of the case? It was that none of the contraband was his, and instead all belonged to his 17–year–old cousin, Darryl Henkle. Henkle did indeed testify that the guns, the drugs, the ammunition, and the other indicia of drug-dealing in the house were all his; that Spinner knew nothing of

any of it; and that he had never, ever, seen Spinner with drugs. Henkle came to court to testify against his own interests, he told the jury, in order "[t]o clear my cousin's name because he shouldn't have to go to jail for something that I did." Trial Tr. 868 (Feb. 10, 1997).

This must have been quite a lot for any rational juror to swallow. The jury was advised that the 17–year–old previously had pled guilty in juvenile court to charges involving "possession of these firearms and the drug evidence in this case," had received a sentence of "house arrest and community service," *id.*, and could not "be further prosecuted," *id.* at 949. Mr. Henkle, then, had nothing at risk and only his cousin to save by bravely taking all the weight upon himself. Moreover, Henkle was caught in a bold-faced lie while trying to do just that. He testified that he had found all of the guns in a car owned by Spinner's brother Robert, after Robert was shot to death in 1995, and that he had hidden them in the house without Spinner's knowledge. There was only one small problem: an official from the Sturm–Ruger Company testified that the Sturm–Ruger pistol found in the house had not even been shipped from the factory until two months after Robert was killed.

The cross-examination which the majority and I have addressed at length took no more than a few minutes out of a week-long trial. It was one of dozens of such evidentiary rulings in the course of that trial. In recognition of the real-life context in which such rulings are made, and the cost to the rule of law if every mistake required a retrial, we review such trial court decisions only for abuse of the court's discretion. *See, e.g., United States v. Graham*, 83 F.3d 1466, 1473 (D.C.Cir.1996). Moreover, even where there is such an abuse, Federal Rule of Evidence 103(a) instructs us that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected," and Federal Rule of Criminal Procedure 52(a) provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." *See United States v. Russo*, 104 F.3d 431, 434 (D.C.Cir.1997). Because Spinner's substantial rights were not affected by the cross-examination of his girlfriend, I would affirm his conviction for possession with intent to distribute crack cocaine.

Accordingly, I dissent from the majority's reversal of the two convictions discussed above, while concurring in the majority's affirmance of the remaining convictions.